# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70418-4-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| TERRANCE JON IRBY, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 20, 2015 |

BECKER, J. — This appeal from a conviction for aggravated murder is

unusual in that defendant Terrance Irby waived both his right to be represented

at trial and his right to be present. Irby's absence did not excuse the trial court

and the prosecutor from their responsibility to assure that Irby's jury was fair and

impartial. One of the jurors said during voir dire that she "would like to say he's

guilty." There was no inquiry by the court or the prosecutor that might have

neutralized the meaning of these words. When a juror makes an unqualified

statement expressing actual bias, seating the juror is a manifest constitutional

error. Irby is entitled to a new trial.

## FACTS

On March 11, 2005, an officer was dispatched to check on James Rock at

his residence in rural Skagit County. Rock had not showed up for a scheduled

ride provided by a transportation service for the elderly. Rock's body was found in his shop, a large metal garage-type structure set apart from his house by a breezeway. He had been beaten to death several days earlier with a variety of blunt and sharp weapons. Detectives called to the scene found that Rock's bedroom door had been forced open. Several weapons he kept there were missing.

Investigation led to Terrance Irby, a known associate of Rock. Rock's neighbors had seen Irby in the neighborhood on March 8. Irby was soon located in custody in Marysville. He had been arrested there on March 8, after running a red light and attempting to elude police. In Irby's truck, officers found Rock's weapons and boots splashed with Rock's blood.

At Irby's first trial in January 2007, a jury convicted him on charges of aggravated murder in the first degree, burglary in the first degree, and felony murder. In 2011, our Supreme Court reversed Irby's convictions because of a violation of his right to a public trial. The violation occurred when the court and the attorneys agreed by e-mail, without Irby's participation, to dismiss some of the potential jurors before voir dire began. State v. Irby, 170 Wn.2d 874, 246 P.3d 796 (2011).

On remand, the State prosecuted the same charges. The trial court granted Irby's request to proceed pro se. Irby had three different standby counselors. He fired all of them before the second trial began.

On March 5, 2013—the first day scheduled for voir dire—Irby voluntarily absented himself from the trial. Irby said he did not believe he could get a fair

2

trial in Skagit County.  By Irby's choice, the trial proceeded before a jury that had been picked without any participation by Irby.  The trial court recognized the difficulty of providing a fair trial to an unrepresented defendant who is tried in absentia.  Every day before trial resumed, the trial court had Irby brought from the jail into the courtroom so that the court could verify that he still wanted to remain absent.  The jury convicted Irby as charged on March 12, 2013.

Irby was represented by counsel at sentencing.  Irby's sentence for the aggravated murder conviction was life without the possibility of parole or release. Irby's sentence for the burglary conviction was life without parole as a persistent offender, based on the court's determination that he had two prior strike offenses. The trial court vacated the felony murder conviction to avoid double jeopardy. Irby appeals the judgment and sentence.

## JUROR BIAS

The primary issue is whether juror bias violated Irby's right to a fair and impartial jury.

At the beginning of voir dire, the trial judge posed a general question designed to elicit potential bias:

> We all have our own perceptions of how things should or ought to
> be.  We acknowledge that all humans are different.  The point is
> could we put aside our personal experiences and sit in judgment as
> a juror and give both Mr. Irby and the State of Washington a fair
> trial on a level playing field.  That's our purpose of these questions.
>     Now, that being the case does anybody have anything in
> their past or anything on their mind that you think wow this just
> might not be the case for me.  I'm not sure I can do this based on
> the circumstances.

Juror 38 raised her hand, leading to the following exchange:

3

JUROR NO. 38: I'm a little concerned because I did work for the government, Child Protective Services, I'm more inclined towards the prosecution I guess.

THE COURT: Would that impact your ability to be a fair and impartial juror? Do you think you could listen to both sides, listen to the whole story so to speak?

JUROR NO. 38: I would like to say he's guilty.

There was no follow-up to this exchange. The judge went on to a different juror, and juror 38 was never questioned individually about her remark that she "would like to say he's guilty."

Later, one of the prosecutors posed a general question about whether anyone had a particularly good or bad experience with police. Juror 27 disclosed that she was inclined to believe law enforcement witnesses. She described herself as "pro police officer":

JUROR NO. 27: I don't know whether it's necessarily good or bad. My dad retired as a Skagit County Sheriff about six years or so. So I kind of grew up, I knew a lot of older guys now. So I'm just more comfortable more inclined toward, you know, what they say just because I'm more comfortable with police officers.

[PROSECUTOR]: Do you think you would be more inclined to believe a law enforcement officer if they are a witness in a particular case?

JUROR NO. 27: I think I'm more inclined because I'm comfortable. And I also work in a hospital and, you know, we have a lot of guys bringing people in through ER whether it's firemen or policemen. I'm just more comfortable with them, I guess. I have to believe what they say when they bring people in. So I'm just more inclined in that direction, I guess.

[PROSECUTOR]: You've never—from what I recall you've never dealt with any law enforcement officers in this particular case?

JUROR NO. 27: I know a couple of them not super well, but I do know them.

[PROSECUTOR]: Do you believe . . . do you think you can put any personal connection you have with law enforcement aside and decide this case based upon the evidence that's going to come in this courtroom and decide the case based on that?

4

JUROR NO. 27: I think it will be hard for me just because he isn't represented at all. So I'm kind of pro police officer.

[PROSECUTOR]: In your mind it's a combination of those two that causes you a little concern?

JUROR NO. 27: Yes, it causes me concern. I will try, but it does cause me some concern.

Juror 27 was not heard from again in voir dire.

Juror 38 spoke up in response to this question and related a positive experience she had with police when she came home and found her mother had died. "The police came out and were questioning me. . . . They were very compassionate, and very understanding, and helpful." Juror 38 later gave a neutral answer to a general question about how to evaluate differing expert opinions.

Voir dire ended with the prosecutor asking generally whether everyone thought they could hold the State to its burden and bring in a verdict based on the evidence:

> So, again, I just want to reiterate the State's burden here. Even if there's nobody sitting here through the whole process challenging the evidence, cross examining, presenting its own evidence what have you ultimately comes down to the State's burden. And I think each and every one of you said this morning you are willing to hold the State to its burden. So, you know, potentially maybe you foresee yourself on this jury. Could people here still find—I mean you have to weigh the evidence that you hear. That's all you can do. If you put the State to its burden, as you are being asked to, does everybody here think that they can basically make a finding of guilty or not guilty based on the evidence that you hear? Yes? Okay. Alright.

A number of potential jurors were excused for hardship. The State successfully sought to have another potential juror excused for cause. The State used five peremptory challenges. Jurors 27 and 38 were seated on the jury.

5

Irby contends these two jurors, particularly juror 38, should have been removed for cause because their remarks demonstrated actual bias against him. The State responds that the issue of juror bias is not properly before this court. Irby, who was neither present nor represented, did not challenge these jurors for cause in the trial court, and the State contends that he forfeited his right to an impartial jury by failing to give the trial court an opportunity to rule correctly on the challenge he now brings.

Under RAP 2.5(a)(3), a party may raise for the first time on appeal a "manifest error affecting a constitutional right." Criminal defendants have a federal and state constitutional right to a fair and impartial jury. Taylor v. Louisiana, 419 U.S. 522, 526, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); State v. Brett, 126 Wn.2d 136, 157, 892 P.2d 29 (1995), cert. denied, 516 U.S. 1121 (1996). The error alleged here, seating a biased juror, violates this right. In re Personal Restraint of Yates, 177 Wn.2d 1, 30, 296 P.3d 872 (2013). A trial judge has an independent obligation to protect that right, regardless of inaction by counsel or the defendant. See State v. Davis, 175 Wn.2d 287, 316, 290 P.3d 43 (2012), cert. denied, 134 S. Ct. 62 (2013); Hughes v. United States, 258 F.3d 453, 464 (6th Cir. 2001).

A constitutional error is manifest where there is prejudice, meaning a plausible showing by the appellant that the asserted error had practical and identifiable consequences in the trial. State v. Gordon, 172 Wn.2d 671, 676, 260 P.3d 884 (2011). The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of prejudice. United States v. Gonzalez,

214 F.3d 1109, 1111 (9th Cir. 2000). Thus, if the record demonstrates the actual bias of a juror, seating the biased juror was by definition a manifest error. Irby's failure to challenge the two jurors for cause at trial does not preclude him from raising the issue of actual bias on appeal.

Irby contends jurors 27 and 38 unmistakably manifested actual bias. Actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2).

If it appears that a juror has formed an opinion, "such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190. The trial court has broad discretion when considering "all the circumstances":

> The trial judge is in the best position to evaluate whether a particular potential juror is able to be fair and impartial based on observation of mannerisms, demeanor, and the like.

State v. Gonzales, 111 Wn. App. 276, 278, 45 P.3d 205 (2002), review denied, 148 Wn.2d 1012 (2003).

Notwithstanding the high degree of deference owed to the trial court in the conduct of voir dire, the seating of an unchallenged juror who displayed actual basis led to remand for a new trial in Hughes, where the Sixth Circuit found "a complete lapse" by the trial court in carrying out its obligation on voir dire. Hughes, 258 F.3d at 464. The court had asked the potential jurors during voir

dire whether they thought they could be fair. One of the jurors volunteered that she had "'quite close'" connections to police officers. When the court asked if anything in that relationship would prevent her from being fair, she said, "'I don't think I could be fair.'" The court asked her again, "'You don't think you could be fair?'" The juror answered, "'No.'" Hughes, 258 F.3d at 456. The court went on to other jurors, and there was no follow-up to this exchange. The juror did not respond to later general questions defense counsel posed to the group, including whether they would find a police officer witness more credible. Nor did she or any other juror respond when the court asked the group "if they all could find at that moment that Petitioner was not guilty because there had not yet been any testimony." Hughes, 258 F.3d at 456.

Defendant Hughes was convicted, and his appeal claimed ineffective assistance of counsel. Hughes alleged that he had asked his attorney to have this juror excused for cause. The Sixth Circuit noted that defense counsel "did challenge two other jurors for cause, and declined the court's invitation to challenge additional jurors." Also, at the close of evidence, "Hughes answered affirmatively when asked by the district court if he was satisfied with his counsel's representation up to that point." Hughes, 258 F.3d at 456.

The court acknowledged that the adequacy of voir dire is not easily subject to appellate review. Hughes, 258 F.3d at 457. The court discussed a number of cases where relief was denied on appeal notwithstanding the seating of jurors who, during voir dire, made statements indicating actual bias. The court held Hughes' case was distinguished from these precedents by "the conspicuous

lack of response, by both counsel and the trial judge, to Orman's [the juror's] clear declaration that she did not think she could be a fair juror." Hughes, 258 F.3d at 458.

> The district court's reliance on unrelated group questioning of potential jurors on *voir dire* does not address the simple fact that neither counsel nor the court offered any response to Orman's declaration or follow-up questions directed to Orman. Although the precedent of the Supreme Court and this Court makes us circumspect about finding actual juror bias, such precedent does not prevent us from examining the compelling circumstances presented by the facts of this case-where both the district court and counsel failed to conduct the most rudimentary inquiry of the potential juror to inquire further into her statement that she could not be fair.
> The above precedents included key elements of juror rehabilitation and juror assurances of impartiality which are absent here.

Hughes, 258 F.3d at 458-59.

The reasoning of Hughes is in accord with our decision in Gonzales. In Gonzales, a juror candidly admitted she would have a "'very difficult'" time disbelieving a police officer and was not certain she could apply the presumption of innocence. Gonzales, 111 Wn. App. at 282. We recognized this statement as a clear indicator of bias that was never neutralized by further questioning. "At no time did Juror 11 express confidence in her ability to deliberate fairly or to follow the judge's instructions regarding the presumption of innocence." Gonzales, 111 Wn. App. at 282. We held that the juror demonstrated actual bias, and the trial court abused its discretion by denying a challenge for cause. Gonzales, 111 Wn. App. at 282; see also City of Cheney v. Grunewald, 55 Wn. App. 807, 810-11, 780 P.2d 1332 (1989).

Here, the record does not clearly demonstrate actual bias on the part of juror 27. She did say she was predisposed to believe police officers because of family relationships and work experience. But the State pressed her in two follow-up questions that stressed the importance of putting personal connections aside and deciding the case only on the evidence. She responded that although she had some concerns, "I will try." It was within the court's discretion to view juror 27's answers as an adequate assurance of impartiality.

The same cannot be said about juror 38. In response to a question designed to gauge her ability to judge Irby fairly, her answer was she "would like to say he's guilty." This is like the Hughes juror's unqualified statement that she did not think she could be fair. And like in Hughes, there was a "conspicuous lack of response." Hughes, 258 F.3d at 458. Neither the trial court nor the prosecutor attempted to elicit from juror 38, individually, an assurance that she had an open mind on the issue of guilt.

At the end of voir dire, the prosecutor reiterated the State's burden of proof and questioned the group generally: "does everybody here think that they can basically make a finding of guilty or not guilty based on the evidence that you hear?" The State contends juror 38's impartiality can be inferred from the fact that she, like the rest of the potential jurors, made no response to this question. But such questions directed to the group cannot substitute for individual questioning of a juror who has expressed actual bias. Hughes, 258 F.3d at 461.

The record reflects that the trial judge and the prosecutor knew that Irby's refusal to participate did not excuse them from the duty of impaneling a fair and

10

impartial jury. The State argues that when the exchange with juror 38 is viewed in the context of the trial court's overall conscientious attention to protecting Irby's rights, the statement "I would like to say he's guilty" need not be taken literally. We can infer, the State suggests, that something in the juror's demeanor permitted the court to overlook the literal meaning of the words—perhaps a questioning tone of voice or a nervous reaction to the prospect of being a juror in a case where the State had no adversary. But to adopt that rationale would make an allegation of actual bias essentially unreviewable in the absence of a challenge in the trial court. We are unable to imagine how the sentence "I would like to say he's guilty" could be uttered in a tone of voice that would excuse the complete lack of follow-up questions.

We conclude that juror 38 demonstrated actual bias and that seating her was manifest constitutional error requiring reversal of all convictions and remand for a new trial.

## LACK OF JURY UNANIMITY

Irby is entitled to reversal of his conviction for first degree burglary on the additional ground that jurors may not have been unanimous as to which of two acts constituted the burglary.

Under Washington's constitution, a defendant may be convicted only when a unanimous jury concludes the criminal act charged in the information has been committed. WASH. CONST. art. I, § 21; State v. Petrich, 101 Wn.2d 566, 569, 683 P.2d 173 (1984); State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). When the prosecutor presents evidence of several acts which

could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must give what is known as a Petrich instruction requiring all jurors to agree that the same underlying criminal act has been proved beyond a reasonable doubt. State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988), citing Petrich, 101 Wn.2d at 570; State v Workman, 66 Wash. 292, 294-95, 119 P. 751 (1911).

The jury was instructed that, to convict Irby of burglary in the first degree, the State had to prove the following four elements beyond a reasonable doubt:

(1) That on or about the 8th day of March, 2005, the defendant entered or remained unlawfully in a building;
(2) That the entering or remaining was with intent to commit a crime against a person or property therein;
(3) That in so entering or while in the building or in immediate flight from the building, the defendant was armed with a deadly weapon or assaulted a person; and
(4) That the acts occurred in the State of Washington.

Instruction 33.

The evidence presented by the State indicated that Irby entered Rock's shop in order to assault him with a deadly weapon and that Irby stole Rock's guns from the upstairs bedroom in the residence in order to arm himself. The shop and the residence were separate buildings, so these were distinct acts of allegedly unlawful entry. The State invited the jury to rely on either of these acts to convict Irby of first degree burglary. There was no election by the State and no Petrich instruction.

The State claims that the burglary charge involved alternative means rather than multiple acts. When a defendant is charged with a crime that can be committed by alternative means, the jury does not have to be unanimous about

12

which means was used so long as substantial evidence supports each means. Kitchen, 110 Wn.2d at 410. But this was an alternative means case only in the sense that there were two means by which an unlawful entry could be elevated to first degree burglary—if Irby was armed with a deadly weapon or, alternatively, if he assaulted a person. RCW 9A.52.020(1); see element 3 of Instruction 33, quoted above. The fact remains, the State presented two acts in support of the charge of first degree burglary. The prosecutor argued in closing that Irby had committed first degree burglary both by assaulting Rock in the shop and by breaking into the upstairs bedroom to arm himself with Rock's weapons. "And Burglary in the 1st Degree in this case there are two separate ones you can consider." He described two acts of burglary, but only one count was charged.

Such an error is harmless only if no rational trier of fact could have entertained a reasonable doubt that each incident established the crime. Kitchen, 110 Wn.2d at 405-06 (modifying the harmless error standard enunciated in Petrich).

A juror could have easily entertained a reasonable doubt as to the State's claim that Irby burglarized the shop. "A lawful entry, even one accompanied by nefarious intent, is not by itself a burglary." State v. Allen, 127 Wn. App. 125, 137, 110 P.3d 849 (2005). Irby was known to visit Rock. There was no evidence of a forced entry into the shop. Thus, a juror could have rationally doubted that his entry into the shop was without Rock's permission. The fact that Irby bludgeoned Rock once he got inside does not necessarily prove a burglary.

Irby presents no reason to doubt the evidence that Irby committed a burglary of the upstairs bedroom. But because of the evidence of an unlawful entry into the shop was subject to reasonable doubt, the failure to give a unanimity instruction was not harmless.

The violation of Irby's right to jury unanimity on the first degree burglary charge constitutes a ground for reversal independent of juror bias. And because the burglary was the predicate crime for the felony murder conviction, the lack of assurance of jury unanimity as to the particular act that constituted the burglary also requires reversal of the felony murder conviction.

## AGGRAVATING CIRCUMSTANCES

Irby does not challenge the sufficiency of the evidence supporting the jury's finding that he committed first degree premeditated murder. But he does challenge the sufficiency of the evidence to support the aggravating circumstances the jury found by special verdict that required his sentence to be life without parole or release.

Challenges to the sufficiency of the evidence are reviewed in the light most favorable to the State. State v. Hacheney, 160 Wn.2d 503, 512, 158 P.3d 1152 (2007), cert. denied, 552 U.S. 1148 (2008).

The State charged two aggravating circumstances: (1) the murder was committed in the course of, in furtherance of, or in immediate flight from burglary in the first or second degree or residential burglary and (2) the murder was committed to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime. Instruction 11; RCW 10.95.020(9)

14

(concealment); RCW 10.95.020(11) (committed in the course of a felony). The State's closing argument did not identify any particular item of evidence that supported either aggravator. The prosecutor merely recited the aggravating factors and asked the jury to "return verdicts on those aggravating factors that yes, each of them was committed based on the evidence that you were given during this case."

The special verdict form split the two aggravators into five questions. The jury answered "yes" to all but one of them:

> We, the jury, having found the defendant guilty of premeditated murder in the first degree as defined in instruction 8, unanimously make the following answers to the questions submitted by the court:
> Has the State proven the existence of the following aggravating circumstance beyond a reasonable doubt?
> Did the defendant intend to conceal the commission of a crime?
> **ANSWER:** _yes_
> (Yes, No or Not Unanimous)
> Did the defendant intend to protect or conceal the identity of any person committing a crime?
> **ANSWER:** _yes_
> (Yes, No or Not Unanimous)
> Was the murder committed in the course of, in furtherance of, or in immediate flight from burglary in the first degree?
> **ANSWER:** _yes_
> (Yes, No or Not Unanimous)
> Was the murder committed in the course of, in furtherance of, or in immediate flight from burglary in the second degree?
> **ANSWER:** _no_
> (Yes, No or Not Unanimous)
> Was the murder committed in the course of, in furtherance of, or in immediate flight from residential burglary?
> **ANSWER:** _yes_
> (Yes, No or Not Unanimous)

Special verdict form 1(B), jury's handwritten findings in italics.

15

*Murder Committed in the Course of a Burglary*

We first address whether evidence supported the jury's decision that the murder was committed in the course of, in furtherance of, or in immediate flight from burglary in the first degree or residential burglary.

Chronology is important in proving that a murder was committed in the course of a felony. The State must present evidence that the death was a probable consequence of the felony and must specifically prove that the felony began before the killing. Hacheney, 160 Wn.2d at 518.

Here, the evidence was overwhelming that Irby committed the murder inside Rock's shop. Irby argues the evidence was insufficient to prove that the murder in the shop was preceded by any type of burglary.

The State has abandoned the position that the burglary aggravator can supported by burglary in the first degree of the shop. Brief of Respondent at 29. The State argues that the burglary aggravator is supported by the residential burglary Irby committed by breaking into the upstairs bedroom and stealing the guns. The problem with the State's argument is that no evidence establishes that the burglary of the upstairs bedroom preceded the murder. It is equally possible that Irby first encountered Rock in the shop, killed him, and only then went upstairs to break into the bedroom and steal the guns.

Facing this logical difficulty, the State asserts that the murder and the burglary were part of the same transaction or res gestae, having occurred more or less at the same time and place, and with the theft of the guns arguably supplying the motive for the murder. According to the State, in these

circumstances proof of chronological order is not strictly required. But as Hacheney explains, it has never been the law—notwithstanding potentially misleading language in older cases that the State relies on here—that it is sufficient merely to show the killing and the felony were part of the same transaction. For a killing to have occurred in the course of burglary, "logic dictates" that the burglary must have begun before the killing. Hacheney, 160 Wn.2d at 518.

The State argues that the burglary aggravator can be sustained because there is no evidence the killing began before the burglary. We reject this argument. The State has the burden of proof of aggravating circumstances. The State failed to meet its burden to prove the burglary preceded the killing.

Because it would require speculation to place the upstairs burglary before the murder in the chronology of events, we cannot sustain the jury's finding that the murder was "committed in the course of, in furtherance of, or in immediate flight from residential burglary."

<u>Murder Committed To Conceal Another Crime or Identity of Perpetrator</u>

We next address whether evidence supported the jury's findings that Irby intended "to conceal the commission of the crime" and intended "to protect or conceal the identity of any person committing a crime."

The concealment aggravator may be established by evidence that the killing was intended to postpone, for a significant period of time, the discovery of a crime or the identity of the perpetrators. Brett, 126 Wn.2d at 167. The concealment must pertain to some crime other than the murder itself. See State

v. Longworth, 52 Wn. App. 453, 461-63, 761 P.2d 67 (1988), review denied, 112 Wn.2d 1006 (1989). For example, in Brett the concealment aggravator was supported by the defendant's statement, before committing a home invasion robbery, that masks would not be necessary because there would be no survivors. Brett, 126 Wn.2d at 167-68; see also State v. Pirtle, 127 Wn.2d 628, 904 P.2d 245 (1995) (concealment aggravator appropriate where second killing was intended to conceal the commission of a robbery and the first killing), cert. denied, 518 U.S. 1026 (1996).

Again, the absence of evidence establishing the sequence of events is critical. There is simply no proof that Irby killed Rock to conceal the burglary or his own role in it. The burglary may have been an afterthought to the murder. We conclude insufficient evidence supports the jury's finding of a concealment aggravator.

## FELONY MURDER

The jury found Irby guilty of first degree felony murder as well as premeditated murder. The charge was that Irby caused Rock's death in the course of, in furtherance of, or in immediate flight from burglary in the first degree. Instruction 17 (to-convict instruction for first-degree felony murder); RCW 9A.32.030(1)(c) (definition of felony murder). The trial court vacated the felony murder conviction to avoid a double jeopardy problem, but Irby is nonetheless entitled to challenge the sufficiency of the evidence to support the felony murder charge.

There is no distinction between the analysis of the sufficiency of the evidence to support felony murder as charged and the similar aggravating circumstance. Both require that the killing occurred in the course of, in furtherance of, or in immediate flight from a felony. Hacheney, 160 Wn.2d at 515. For the same reason that we have concluded the aggravator was not supported by the evidence, we conclude Irby's conviction for felony murder was not supported by the evidence. This conclusion furnishes yet another basis for reversing the felony murder conviction. And it renders moot Irby's contention that the court erred by making the vacation of the felony murder conditional upon the conviction for premeditated murder surviving appellate review or collateral attack. See State v. Turner, 169 Wn.2d 448, 465-66, 238 P.3d 461 (2010).

## REMEDY FOR INSUFFICIENT EVIDENCE

In summary, none of the special verdict findings of aggravating circumstances are supported by the evidence, and the felony murder verdict is not supported by the evidence. The remedy when the State presents insufficient evidence is dismissal with prejudice. State v. Hickman, 135 Wn.2d 97, 103, 954 P.2d 900 (1998). The State may retry Irby on the charge of first degree premeditated murder but may not allege aggravating circumstances under RCW 10.95.020(9) or RCW 10.95.020(11) and may not retry him on the charge of felony murder.

## COMPARABILITY OF PRIOR CONVICTION

Irby was sentenced to life without parole or release on two grounds. His sentence for aggravated murder under RCW 10.95.020 is no longer viable

19

because of our dismissal with prejudice of the findings of aggravated circumstances. His sentence to life without parole for first degree burglary was grounded on the court's determination that Irby is a persistent offender under the Persistent Offender Accountability Act, RCW 9.94A.570, also known as the "three strikes law." State v. Manussier, 129 Wn.2d 652, 659, 921 P.2d 473 (1996). A "persistent offender" is someone who, at sentencing for a most serious offense conviction, has previously been convicted on two separate occasions of most serious offenses under RCW 9.94A.525. RCW 9.94A.030(37). The court determined that Irby's two previous strikes were a 1976 conviction for statutory rape in the second degree and a 1984 conviction for second degree assault with a firearm enhancement.

Statutory rape, as it was defined in 1976, is no longer a crime in Washington, but a conviction for statutory rape may count as a strike if it is comparable to a crime that is currently a most serious offense. The trial court determined that Irby's 1976 conviction was comparable to rape of a child in the second degree, a crime currently included in the list of most serious offenses. RCW 9.94A.030(32). Irby contends the crimes are not comparable. Although the reversal of Irby's convictions will also reverse his sentence, we address the comparability issue because it may arise again after a retrial.

A two-part test is used to determine comparability. In re Pers. Restraint of Lavery, 154 Wn.2d 249, 255, 111 P.3d 837 (2005). First, the elements of the crimes are compared to determine whether they are substantially similar. If so, they are legally comparable. Lavery, 154 Wn.2d at 255. Second, if the crimes

20

are not legally comparable, the record is examined to determine whether the defendant's conduct in the past offense, as evidenced by the indictment or information or other records of the past conviction directly related to the elements of the charged crime, would have violated a comparable Washington statute. This is referred to as factual comparability. See Lavery, 154 Wn.2d at 255.

In 1976, a person over 16 years old committed statutory rape in the second degree if the victim was at least 11 years old but not yet 14.

> A person over sixteen years of age is guilty of statutory rape in the second degree when such person engages in sexual intercourse with another person, not married to the perpetrator, who is eleven years of age or older but less than fourteen years old.

Former RCW 9.79.210(1) (1975). Now, a person who is at least 36 months older than the victim commits rape of a child in the second degree when the victim is at least 12 years old but not yet 14.

> A person is guilty of rape of a child in the second degree when the person has sexual intercourse with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim.

RCW 9A.44.076(1).

Both offenses require proof that the victim was less than 14 years old at the time of the offense. But one of the elements of a statutory rape prosecution was that the offender was over 16 years old. In a current prosecution for second degree child rape, the State need not prove the offender is over 16 years old. The offender can be younger than 16 so long as he is at least 36 months older than the victim. Another difference is that the former statutory rape offense was defined to include 11-year-old victims, while only 12- and 13-year-old victims are

21

included in the current offense of second degree child rape. Thus, as the parties agree, the crimes are not legally comparable.

In this case, the determination of factual comparability implicates Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). State v. Ortega, 120 Wn. App. 165, 171-74, 84 P.3d 935 (2004), review granted in part and remanded, 154 Wn.2d 1031, 119 P.3d 852 (2005); Lavery, 154 Wn.2d at 256-58. Life without the possibility of parole is a penalty beyond the top of the standard range for first degree burglary. The top of the standard range is the "statutory maximum" as that phrase is used in Apprendi. State v. Evans, 154 Wn.2d 438, 441-42, 114 P.3d 627, cert. denied, 546 U.S. 983 (2005). The underlying facts of Irby's 1976 conviction will serve to prove factual comparability only if the record of the past case shows they were admitted, stipulated to, or found by the trier of fact beyond a reasonable doubt. Ortega, 120 Wn. App. at 172.

Irby did not plead guilty in 1976. No facts were admitted or stipulated. Irby went to trial, and the verdict states that he was "Guilty as charged in the Information." The information is the only document available to demonstrate what facts the jury necessarily found proven beyond a reasonable doubt when it found him guilty as charged.

The information charged that Irby, on May 31, 1976, in Chelan County, "being over sixteen years of age, did then and there engage in sexual intercourse with [victim], not being married to [victim], who was thirteen years of age." The information was filed in Chelan Superior Court on July 8, 1976.

22

Because the verdict found Irby guilty "as charged in the Information," it is proof that the jury found the victim was 13 years old on May 31, 1976, and found that Irby was at least 16. But the jury did not find that Irby was more than 36 months older than the victim on that date. The information is not sufficiently precise to prove that element. It did not allege the birth date of either Irby or the victim. So far as the information reveals, Irby may have been only 16 and the victim may have been one day short of 14. The information and verdict together do not prove a 36-month difference between their ages.

When this issue was raised below, the trial court found Irby's date of birth established by certified records from other court cases and concluded that Irby was almost 18 years old when the crime was committed. On appeal, the State correctly does not pursue this argument as it depends on judicial fact-finding, which is impermissible under Apprendi. Without the additional fact of Irby's date of birth, the trial court was not authorized to count the 1976 conviction as a strike and use it to increase the penalty for first degree burglary to life without parole. See Ortega, 120 Wn. App. at 171-72.

On appeal, the State argues that a 36-month age disparity between Irby and his 1976 victim was proved satisfactorily by documents showing that the information was filed in Chelan County Superior Court. According to the State, Irby was necessarily over 18 on July 8, 1976, the date the information was filed, because juvenile court law did not permit individuals under the age of 18 to be charged in superior court. "Since he was at least age eighteen when the case was filed, he was also at least age seventeen when the offense occurred just

23

under a month and a half before it was filed. Thus, this Court can be certain that Irby was over age seventeen when the offense occurred which is greater than thirty-six months older than the victim."

This argument too must fail because it supplies a finding on a factual issue that was not before the jury in 1976. The 1976 jury was not asked to deduce Irby's date of birth from a procedural statute; it was only asked to find that he was more than 16 years old. In 1976, the State had no reason to convince the jury that Irby was 18, and Irby had no reason to prove he was not. See Lavery, 154 Wn.2d at 249. The underlying fact of Irby's date of birth was not found by the trier of fact beyond a reasonable doubt and consequently "may not be used to increase the penalty of a subsequent conviction beyond the statutory maximum." Ortega, 120 Wn. App. at 172.

Because the State presented insufficient evidence to prove that the 1976 conviction is factually comparable to a strike offense, it was error to conclude that Irby could be sentenced to life without parole as a persistent offender.

## STATEMENT OF ADDITIONAL GROUNDS

Irby has submitted a wide-ranging 50-page statement listing at least 14 additional grounds for review. Many of his allegations concern matters outside the record. The rest are too incoherent to warrant serious attention. We find no basis for conducting review of issues other than those identified in the brief of appellant.

All convictions are reversed because of the violation of Irby's right to a fair and impartial jury. The aggravating circumstances for first degree murder and

the felony murder conviction are reversed with prejudice for insufficiency of the evidence.

WE CONCUR:

Becker, J.

Spearman, C.J.

Lau, J.