**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON

Respondent,

v.

JAMES STEVEN LIPTRAP,

Appellant.

No. 82731-6-I

DIVISION ONE

UNPUBLISHED OPINION

BIRK, J. — James Liptrap appeals his conviction for felony driving while under the influence (DUI), contending four jurors seated on the jury held actual bias, violating his constitutional right to a fair and impartial jury. He also claims, and the State concedes, that the judgment and sentence imposes a discretionary legal financial obligation (LFO) that must be stricken because he is indigent. We affirm the conviction but remand to strike the LFO.

FACTS

Following a traffic stop in September 2020, Arlington Police Officer Alex Donchez arrested James Liptrap for suspicion of DUI. The State charged Liptrap with one count of felony DUI.

During jury selection, the parties initially agreed to strike one juror for cause. Liptrap challenged three other jurors for cause. The trial court partially agreed and struck two of the three jurors. Liptrap used peremptory challenges to disqualify four additional jurors. He accepted the jury panel without raising any challenges

to jurors 6, 9, 13, and 21 (who became juror 4 once seated in the jury). Liptrap had three peremptory challenges remaining when he accepted the panel.

Only Officer Donchez and Liptrap testified at trial. The jury found Liptrap guilty as charged.

At sentencing, Liptrap asked the trial court to "waive all non-mandatory, all discretionary costs" because he was "statutorily indigent." After imposing "the $500 mandatory victim penalty and $100 DNA [(deoxyribonucleic acid)] sample fee," the court found Liptrap indigent and waived "all other financial obligations." However, the trial court entered a judgment and sentence containing preprinted language that requires Liptrap to "pay supervision fees as determined by" the Department of Corrections while on community custody.

DISCUSSION

Liptrap raises two issues on appeal. First, he alleges that biased jurors were allowed to sit on the jury. Second, he claims the trial court mistakenly imposed a discretionary LFO.

I. The Record Does Not Establish That The Jurors At Issue Exhibited Actual Bias

The State asserts that Liptrap has waived review of his juror bias claims because he accepted the jury panel without moving to disqualify any of the jurors that he now challenges for cause. Liptrap contends that he was denied his constitutional right to a fair and impartial jury when the trial court allowed jurors 6, 9, 13, and 21, each of whom he says were actually biased, to sit on the jury. We find no error in the record.

2

Actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). The trial court must dismiss a biased juror. State v. Guevara Diaz, 11 Wn. App. 2d 843, 855, 456 P.3d 869, review denied, 195 Wn.2d 1025, 466 P.3d 772 (2020). But, even if a juror seems to have formed an opinion, the trial court need not dismiss the juror unless it is "satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190; State v. Lawler, 194 Wn. App. 275, 281, 374 P.3d 278 (2016). This is so because "[t]he trial judge is in the best position to evaluate whether a particular potential juror is able to be fair and impartial based on observation of mannerisms, demeanor, and the like." State v. Gonzales, 111 Wn. App. 276, 278, 45 P.3d 205 (2002). We review a court's failure to dismiss a biased juror for a manifest abuse of discretion. Id.

A.      Juror 6

Liptrap claims juror 6 demonstrated actual bias by "expressly stat[ing] she would hold it against Liptrap if the defense did not present evidence" and reporting "she could not otherwise acquit." But the juror did not commit to so concrete a position, as shown by the following colloquy:

> [THE DEFENSE]: Of everybody who said that they were expecting to hear evidence from the defense, is there anybody who would have a hard time or it would be harder for them to acquit a defendant if all the defense did was just poke holes in the State's case, just point out issues with the State's evidence, make arguments about why the State's evidence is not enough, but they don't present any evidence of their own? Is it going to be difficult for

anybody here to acquit a Defendant if you're a juror put in that position?

No? Nobody? Okay. I'm going to pick on some people. Juror No. 6, how about you?

JUROR NO. 6: Well, evidence obviously will help, but it's not – it won't – it will be easier if there was any. But depending on how questions will be asked, how the answers will be given, that would be, I guess, enough to come to a conclusion.

[THE DEFENSE]: Okay.

JUROR NO. 6: But, again, evidence is – will help the process.

[THE DEFENSE]: Okay. What if – the burden being on the State here, what if the defense didn't even ask any questions? What if we just sat back and said, hey, you juror, take a look at what the State has to offer and just make your decision guilty or not guilty. Do you think in that position you would be able to still acquit a defendant?

JUROR NO. 6: I don't think so. I think it would be difficult for me if there [are] no answers and questions.

[THE DEFENSE]: Okay. So you don't think that you would be able to find somebody not guilty if their defense attorneys just sat there wearing suits and didn't say anything?

JUROR NO. 6: No.

[THE DEFENSE]: Okay. All right. What if I told you you had to be able to do that? Would that change how you feel about that?

. . . .

JUROR NO. 6: I will need still to hear some convincing answers and questions. I will need to hear.

[THE DEFENSE]: Okay. What if . . . the prosecutor, what if he told you you had to be able to do that?

JUROR NO. 6: Oh, nothing will convince me.

[THE DEFENSE]: Nobody?

JUROR NO. 6: I don't know that I will either be able to do that or not, so . . .

[THE DEFENSE]: And you were thinking not?

JUROR NO. 6: I'm think – I can say not. I said it will be helpful to have evidence, but – and to have definite question and answers.

[THE DEFENSE]: Okay. And if you don't have that, are you going to be able to acquit a defendant when you're the juror on their case?

JUROR NO. 6: I will not quit, but I will try to do my best and – it's a hard question.

[THE DEFENSE]: Yeah. Yeah. These are hard questions.

4

JUROR NO. 6: No, I will not quit, of course. Still continue.

[THE DEFENSE]: Not quit. Could you still find the defendant not guilty if you didn't hear anything from the defendant or the defense attorneys? They just sat there, and all you heard was [the prosecutor] and his evidence. Would you be able to think you, you know, I don't think that's enough evidence; I don't think the person's guilty?

JUROR NO. 6: Yeah.

[THE DEFENSE]: Yes? Okay. All right. Thanks, Juror No. 6.

This exchange does not establish actual bias on the part of juror 6. This juror acknowledged the difficulty in being able to acquit a defendant whose defense team did not ask any questions at trial, a preference for some questions and answers, but said she would "not quit" and "[s]till continue" in an effort to reach a verdict. Juror 6 also informed the parties that she did not believe that Liptrap was more likely to be guilty than not guilty, nor did she believe that a person who was arrested was probably guilty.

Moreover, there is no indication that this juror would refuse to follow the court's instructions regarding the State's burden of proof. As the trial court noted in its discussion with counsel, the flaw in Liptrap's asking potential jurors whether they would acquit based on the State's or the defense's instructions, is that the question

asked [jurors] to just – like, if they could make up the rules, is what it sounded like, what would their rule of thumb be? And their rule of thumb for some of them wouldn't be the same as the court's rule of thumb. That doesn't tell me whether or not they will follow the court's instruction if it's different than their rule of thumb.

Liptrap has not shown that the trial court abused its discretion in failing to dismiss juror 6 for actual bias.

B.    Juror 9

Next, Liptrap alleges that juror 9's bias "could not be more obvious" because (1) she "admitted that if she was 'on the fence' but the officer was certain a crime had been committed" she would defer to the officer and "would believe the officer 100% over anyone else testifying under oath," and (2) she "likened police officers to trained experts more worthy of belief than the average person."  In context, however, the record shows juror 9's confusion about the question posed and, ultimately, her ability to view the evidence in an impartial manner.

Initially, the defense asked several overview questions to reveal any bias in favor of law enforcement testimony.  Those questions included the ones below, which did not elicit any response from juror 9:

> [THE DEFENSE]:  Who here thinks that if an officer concludes someone committed a crime, that they did it?  You can defer to the officer.  They have training; they're supposed to investigate crimes; if they think he did it, he did it.  Who here thinks that?
> Backing off a little bit, then, here who thinks that's usually true?  Officers might get it wrong; everybody gets it wrong.  But most of the time – 90 percent of the time an officer is going to get it right?
> Nobody?

Later, the defense engaged in the following exchange with juror 9 about reliance on law enforcement:

> [THE DEFENSE]:  Which way would you go if you're on the fence; you don't know whether or not he committed the crime, but the officer is certain?
> . . . .
> JUROR NO. 9:  What was the question again?
> . . . .
> [THE DEFENSE]:    The question is: Would you feel comfortable deferring to an officer's judgment that most of the time if

6

they think someone committed a crime, that person committed a crime?

  Nine, come on up.

   JUROR NO. 9:  I guess I would say if they were under oath, as well as everyone else that was giving evidence, I would believe them 100 percent.  I mean, that's all I can do.  Is that what you're asking?

   [THE DEFENSE]:  No.  I guess I'm not asking whether or not you believe that they're telling the truth.  I'm asking if you'd defer to their opinion.

   JUROR NO. 9:  Yeah.  I mean, I think their opinion is as important as a psychiatrist or an orthopedist or – because they tend to be a little more of a specialist and a little more trained than an average person that's maybe just walking by.

Although initially unclear about the question asked, this exchange shows juror 9's willingness to accept at face value the testimony of a police officer who testifies under oath in the same manner as she would believe "everyone else that was giving evidence" under oath.  Juror 9 was not asked follow-up questions regarding circumstances calling an officer's credibility into question or if she would defer to an officer's testimony or opinion even if contradicted by other witness testimony.

Liptrap cites Gonzales to support his claim that juror 9 should have been dismissed for actual bias.  Gonzales is distinguishable from Liptrap's case.  In Gonzales, "Juror 11 unequivocally admitted a bias regarding a class of persons (here, a bias in favor of police witnesses) and indicated the bias would likely affect her deliberations" and "also candidly admitted she did not know if she could presume Gonzales innocent in the face of officer testimony indicating guilt."  111 Wn. App. at 281.  "At no time did Juror 11 express confidence in her ability to deliberate fairly or to follow the judge's instructions regarding the presumption of

innocence." Id. at 282. Therefore, we concluded that "Juror 11 demonstrated actual bias, and the trial court erred in rejecting Gonzales' cause challenge." Id.

Here, by contrast, in response to the defense's request to rank Liptrap's guilt or innocence on a scale from 0 to 10, "without hearing any evidence, sitting here right now," juror 9 expressed a willingness to presume Liptrap innocent:

> JUROR NO. 9: So with your question, does my answer mean he goes – he's guilty or not guilty?
> [THE DEFENSE]: Yes.
> JUROR NO. 9: Okay. So I have to say zero because he's innocent until proven guilty.

Because juror 9 did not demonstrate actual bias, we see no error in the trial court allowing this juror to serve on the jury.

C.    Juror 13

Liptrap also says reversal is necessary because "Juror 13 opined Liptrap must have done something wrong to find himself facing trial" and "[n]either the court nor the parties sought any assurance Juror 13 had an open mind on the issue of guilt," which amounted to manifest constitutional error. But given the compound nature of the defense's questioning and the juror's answers, we cannot say that juror 13 expressed the opinion that Liptrap now ascribes to him:

> [THE DEFENSE]: Let's keep going with that thought. Who else here thinks that [Liptrap] is sitting here; he must have done something wrong to be sitting here? And if he's not guilty of DUI, that he did something to be sitting here. Who thinks that?
> Anybody think he probably did something? Maybe not necessarily. Maybe he's completely innocent, but probably you wouldn't be sitting in that chair if he was completely innocent, did absolutely nothing wrong.
> Anybody think he – yeah?
> JUROR NO. 13: Yeah.
> . . . .

[THE DEFENSE]: Come on up, 13. You think he probably did something wrong?

JUROR NO. 13: Well, I mean, I would tend to say yes. I believe that an officer wouldn't make an arrest and put somebody through this process if they believed beyond a shadow of a doubt that there – that the person did something wrong to have them be here. Just from their training and experience out there.

[THE DEFENSE]: While I've got you here, I think on your questionnaire it said you'd been convicted of a DUI, and then I have a conflicting note, so I probably got it wrong.

JUROR NO. 13: I was not convicted.

[THE DEFENSE]: Okay. Do you think that you were guilty of that DUI?

JUROR NO. 13: Yes.

[THE DEFENSE]: Do you think that that experience is playing any sort of role in this case?

JUROR NO. 13: No.

[THE DEFENSE]: Given that you haven't heard any evidence yet, but you think he probably did something wrong, do you think that's fair to Mr. Liptrap to come into this with that thought?

JUROR NO. 13: Yes.

Here, the defense asked a half-dozen questions concerning the presumption of innocence and likelihood of wrongdoing at the time of arrest, before juror 13 offered a response. Juror 13 shared his thought that <u>an officer</u> would not arrest someone and put them through this process <u>if the officer did not believe</u> that the person did something wrong. This is not the same as juror 13 believing that Liptrap was arrested for engaging in criminal conduct and put on trial.

Nor was juror 13's comment like juror 38's expression of actual bias in <u>State v. Irby</u>, 187 Wn. App. 183, 347 P.3d 1103 (2015), as Liptrap suggests. In <u>Irby</u>, in response to a "general question designed to elicit potential bias," juror 38 initially stated, "I'm a little concerned because I did work for the government, Child Protective Services, I'm more inclined towards the prosecution I guess." 187 Wn. App. at 190. To that, the trial court inquired, "Would that impact your ability to be

9

a fair and impartial juror? Do you think you could listen to both sides, listen to the whole story so to speak?" Id. Juror 38 answered, "I would like to say he's guilty." Id. There were no follow-up questions. There, we concluded "that juror 38 demonstrated actual bias and that seating her . . . require[ed] reversal of all convictions and remand for a new trial." Id. at 197.

In this case, the record establishes that juror 13 dispelled any notion of bias when he later expressed a willingness to keep an open mind as to Liptrap's guilt. During subsequent questioning, and after acknowledging that "[a] lot of people would want more information," the defense instructed the potential jurors to "pretend you're already seated on this jury" and "have heard no evidence so far." The defense then asked them "to pick a number between zero and 10," with zero being Liptrap is "absolutely . . . not guilty," five being neutral, and ten being "he's 100 percent guilty." When the defense asked for a show of hands from those who ranked Liptrap at five (or neutral), juror 13 was one of several who raised their hand affirmatively. At that point, juror 13 displayed his impartiality on the issue of Liptrap's guilt.

We conclude juror 13 did not demonstrate actual bias and the trial court did not abuse its discretion in seating him on the jury.

D.     Juror 21

Finally, Liptrap contends that juror 21's comment that "court proceedings cost a lot of time and money" "support[s] an opinion Liptrap must be guilty or he would not be facing a trial" and is a show of actual bias. The record does not support this contention.

When the defense asked if any other juror thought Liptrap "probably did something wrong," juror 19 answered, "I'm not sure that he's guilty of anything specific or as the thing he's charged for, but I think he must have done something to be here." The defense then inquired if anybody else agreed with juror 19 and juror 21 responded as follows:

> JUROR NO. 21: . . . Court proceedings cost a lot of time and money, so that if somebody didn't think that he was guilty of something, then we probably wouldn't be here.
> And, you know, the officers are trained to observe, and so I, you know, would need to hear all of the evidence, but – you know.
> [THE DEFENSE]: That makes sense. It's a reasonable assumption. It's called the criminal justice system. We hope that if he gets this far, that there's some merit to the argument, right?
> JUROR NO. 21: (Nods head.)
> [THE DEFENSE]: Okay. But you're entering this scenario thinking he probably did something to deserve sitting in that chair, right?
> JUROR NO. 21: Correct.

This exchange shows juror 21's belief that Liptrap likely would not have been charged if somebody else did not think that he was guilty of something. The defense agreed juror 21's belief made sense, was a "reasonable assumption, and expressed a hope that if a case made it to trial "that there's some merit to the argument."

Furthermore, juror 21 later stated that she "would not make a decision until I heard both sides." And, similar to juror 13 above, juror 21 estimated Liptrap's likelihood of guilt or innocence at five (or neutral). We do not see any actual bias of juror 21 in the record.

Based on the totality of the jurors' comments, we cannot say that the trial court abused its discretion in choosing to refrain from sua sponte excusing the jurors now challenged on appeal. This record did not present the trial court with any "unqualified statement expressing actual bias" within the meaning of Irby. 187 Wn. App. at 188. Because we find no error, we also conclude that there was no manifest error affecting a constitutional right within the meaning of RAP 2.5(a)(3).

II.    Legal Financial Obligation

Liptrap maintains, and the State concedes, that the community custody supervision fees imposed as part of his judgment and sentence are discretionary LFOs and must be stricken because he is indigent. We agree.

Under RCW 10.01.160(3), "[t]he court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent as defined." See State v. Blazina, 182 Wn.2d 827, 839, 344 P.3d 680 (2015) (holding "that RCW 10.01.160(3) requires the record to reflect that the sentencing judge make an individualized inquiry into the defendant's current and future ability to pay before the court imposes LFOs"). The trial court found Liptrap indigent.

Community custody supervision fees are discretionary LFOs that may not be imposed on indigent defendants. State v. Dillon, 12 Wn. App. 2d 133, 152, 456 P.3d 1199 ("Since the supervision fees are waivable by the trial court they are discretionary LFOs."), review denied, 195 Wn.2d 1022, 466 P.3d 198 (2020).

Here, the requirement to pay these supervision fees is not located in the LFO section of Liptrap's judgment and sentence but is contained in a separate section concerning community custody conditions. The record indicates that the

12

trial court intended to impose only mandatory LFOs and waive all discretionary LFOs. Thus, it is clear that the trial court inadvertently imposed the supervision fees, which must be stricken.

CONCLUSION

We remand to the trial court to strike the community custody supervision fees from the judgment and sentence, but we affirm in all other respects.

_Birk, J._

WE CONCUR:

_Smith, A.C.J._     _Dwyer, J._