IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80174-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DAVID ALLEN MOORE, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — David A. Moore seeks reversal of his conviction for murder in the second degree, contending that the trial court erred in allowing him to waive counsel and represent himself at trial and in seating a juror who expressed potential bias during voir dire. Because Moore has not shown that the trial court abused its discretion in determining that his waiver of counsel was knowing, intelligent, and voluntary and has not demonstrated that the juror expressed actual bias, we affirm.

## FACTS

On January 10, 2016, William Cross, a clerk at the Union Station Market in Seattle's International District, was stabbed during an altercation with a customer. Cross died from his injuries. Police collected a black plastic mug that the assailant had thrown in the store's trash can, and the state crime lab matched DNA[1] on the

---

[1] Deoxyribonucleic acid.

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

mug to both Cross and David Moore. A witness later identified Moore as Cross' attacker from a photo montage. Police found a sweatshirt bearing bloodstains that matched Cross' DNA in Moore's storage unit. Moore was charged with murder in the second degree based on alternative theories of felony murder (assault) and intentional murder.

Competency Proceedings and First Order on Motion to Waive Counsel

In August 2016, Moore moved to discharge his appointed attorney, David Trieweiler, based on differences of opinion about the meaning and importance of evidence. Judge Dean Lum denied the motion without prejudice but indicated that the court would entertain a motion based on more specific grounds if noted for in camera review. In September 2016, Moore renewed the motion. Judge Lum found that it was appropriate to close the courtroom to the State and the public for the motion hearing, then denied the request for new counsel.

In November 2016, Judge Lum held a hearing to address Moore's pro se motion to waive counsel and represent himself. The court authorized a brief closure of the courtroom to hear an offer of proof from Trieweiler regarding a request for a competency evaluation. The court found that there was reason to doubt Moore's competency to stand trial and ordered an evaluation at Western State Hospital (WSH).

Moore was admitted to WSH on December 12, 2016, where he remained for observation until December 23, 2016. The parties requested a contested competency hearing, which was held before Judge Mary Roberts in April 2017. Dr. August Piper, the defense expert psychiatrist, testified that he had interviewed

Moore in November 2016 and January 2017.  He also reviewed many of Moore's medical, mental health, and jail records.  Based on the interviews and records, Piper opined that Moore suffered from a delusional disorder that prevented him from rationally assisting counsel.  Piper described a delusion as a belief that a person holds despite a relative lack of evidence that is not part of their cultural or religious background.  Piper noted that a person with a delusional disorder "generally can function reasonably well in areas outside of the delusional belief" and "can look fairly well put together until you get to the subject of the delusion."

Moore was convinced that the entire court system was racist and that he would not be able to have a fair trial because he was African American.  He believed that all white people were racists and out to get him, and that Trieweiler was a member of the Ku Klux Klan.  Piper, who was identified in the record as African American, agreed that racism against African Americans and other people of color is a serious problem in the United States.  However, he found Moore's beliefs to be delusional because of the extent to which Moore thought that "everything in the country is explained by racism and that everything that happens to him is derived because of racist beliefs by other people."  Piper believed that Moore's delusion prevented him from rationally assisting counsel because he was unable to trust his attorney enough to allow for effective representation.

Dr. Ray Hendrickson, a psychological forensic evaluator at WSH, testified that he had evaluated Moore during his stay at WSH.  Although Hendrickson had been unsuccessful in attempting to interview Moore, he was able to form an opinion about Moore's capacity to understand the charges after reviewing hospital

- 3 -

and jail records, prior evaluation reports, and chart notes for the period that he was at WSH. Hendrickson opined that Moore had personality traits of both antisocial and narcissistic personality disorders. After reviewing Moore's records, Hendrickson believed that providers were able to "form a more accurate picture of his presentation" when observing him for a longer period of time. In these instances, the evaluators noted "largely antisocial and narcissistic" traits, as well as some paranoid traits. Hendrickson did not believe that Moore had a psychotic disorder, which he explained as "a thought disorder where people aren't able to organize their thoughts in a concrete manner, . . . they're dissociated, they're— they're disorganized, disconnected." By contrast, he noted that Moore's presentation was "goal directed," and he was able to make his needs known in a way that indicated what he wanted and how he perceived others were reacting to him. Hendrickson acknowledged that Moore had been diagnosed with psychotic disorders in the past, but noted that these diagnoses stemmed from "times when he was viewed for a very short period of time." He found no indication that Moore had a "mental disease or defect, the symptoms of which would impair his ability to have a factual or a rational understanding of the charges and court proceedings he faces." He also opined that Moore exhibited "no symptoms of mental disease or defect that impair his ability or capacity to consult with his attorney with a reasonable degree of rational understanding. Whether he exercises that . . . [is] a volitional choice."

Dr. Margaret Dean, a staff psychiatrist at WSH, testified that she served as Moore's treating psychiatrist at WSH. She had met with him personally and

reviewed his treatment records. Dean found that Moore met the criteria for both antisocial and narcissistic personality disorders. She did not believe that he presented with the signs and symptoms of a psychotic disorder. She noted that he was able to clearly communicate his needs and desires both when he was angry and when he was calm. She opined that "no major mental illness currently interferes with Mr. Moore's capacity to understand the nature of the proceedings against him or to assist defense counsel in his own defense" and that the personality disorders that she had diagnosed did not impact his capacity to understand the proceedings.

Judge Roberts ruled that Moore had not proven by a preponderance of the evidence that he was incapable of assisting counsel and therefore incompetent to stand trial. In its written decision, the court found that it "need not and does not determine the correct diagnosis for Mr. Moore." However, the court found the opinions of Hendrickson and Dean "well-supported and persuasive" and characterized Piper's opinions as "less well-supported and less persuasive than the testimony of Drs. Hendrickson and Dean." The court noted that even if Moore feared or distrusted his attorney, "[a] lack of trust is not a lack of mental capacity to assist."

Defense counsel filed a motion for reconsideration based on the court's refusal to admit certain medical and treatment records and submitted additional documentation that the documents constituted business records. The court declined to reconsider its competency determination but admitted the records for purposes of Moore's pending motion to waive counsel and represent himself. After

hearing from Moore and counsel, Judge Roberts reserved ruling so that she could review the medical records.

In a written ruling, the court denied Moore's motion to waive counsel. The court ruled that, although it had found Moore competent to stand trial, his mental illness rendered his waiver of counsel invalid:

> Although his current symptoms of any mental disease or defect do not rise to the level that they would cause him to lack the capacity to understand the nature of the proceedings against him or lack the capacity [to] assist his attorney in his defense, his mental illness is such that he lacks the capacity to conduct such a defense. The court makes this finding based on a lack of capacity, not a lack of skill.

Because "Moore's mental capacity [would] have serious and negative effects on his the [sic] ability to conduct a defense," the court ruled that his request to waive counsel and proceed pro se was not made knowingly and intelligently.

In June 2017, Trieweiler was permitted to withdraw based on a breakdown of communication and conflict of interest. James Womack was appointed as Moore's replacement counsel. Moore continued to submit documents and motions demanding that he be allowed to represent himself.

Second Order on Motion to Waive Counsel

In November 2018, an omnibus hearing was held before Judge Sean O'Donnell. Moore requested that the court entertain his motions to proceed pro se. Womack stated his understanding that the matter had been ruled on by Judge Roberts, and the court located and reviewed the order denying Moore's previous motion to represent himself. Although not expressly stated in the written order, Judge O'Donnell noted that the previous motion was "denied without prejudice."

- 6 -

The court set a hearing on the pending motion for later that month. At the hearing, Moore explained why he wanted to represent himself:

> [T]his involves race, so no one can defend me but, uhm, Allah and me by a Muslim. My beliefs teach me to put that first before anything and represent myself. It's my faith—it's my faith, practice, to represent myself. If he's not Muslim, he can't represent me, first of all. He just can't, no way possible.

Judge O'Donnell engaged in a lengthy colloquy with Moore, questioning him about his understanding of the charge he faced, the challenges of representing himself, and his knowledge of procedure. The State pointed out that Moore had represented himself in a 2010 King County criminal case and took the position that, if Moore "was unequivocal about his request to go pro se, that he should be allowed to do so." Womack acknowledged that Moore's prior counsel had opposed his repeated requests to represent himself but stated that "[t]he status of the case was different then" and explained his position:

> I don't think in good faith I can take an adverse position . . . to his request. He has made that known. He—as I've indicated for the record, he has made his request known to me directly and has ceased any communication with me, and so the ability of counsel to effectively assist him is—is severely limited.

Judge O'Donnell found the waiver of counsel knowing, voluntary, and intelligent and granted Moore's motion to represent himself.

Trial

The case proceeded to trial in May 2019 before Judge Kristin Richardson. During the court's initial questioning of prospective jurors, it asked Moore if he had any objection to the exclusion of a juror who indicated that her acquaintanceship with the investigating detective would cause her to be biased. He replied,

> Once again, for the record, in front of these juror people, I told you before they came into the courtroom you explained to me that I had no rights in your courtroom whatsoever because of my skin color and religious belief.
> Whatever you do, Allah is akbar.

The court excused the juror.

Another prospective juror revealed that he frequented the convenience store where the stabbing occurred, and he had heard about a stabbing that had occurred there around the same time. He had heard that the culprit had "done this before" and said it would be "tough" for him to remain unbiased. Moore stated, "I have no problem with him being on y'all's (unintelligible) jury. The time you—you speaking of, about five or six stabbings happened within the same time frame he's talking about, so I don't think it have any reference to the area. . . . I'm glad he's safe." The prospective juror was not excused at that time, although he was later excused for hardship. The court also individually questioned a prospective juror who indicated that his history of "harassment" by the Seattle Police Department would affect his ability to be fair. He was excused on the State's motion.

On the second day of jury selection, several prospective jurors were questioned about their relationships to victims of violent crime. Juror 12 reported that her sister had gone missing in 1991, and the juror considered it a violent crime because she believed she had been abducted. Juror 12 stated that the Lynnwood Police Department had investigated and "were told that there were several sightings of her in the company of an African-American individual . . . but all leads led to nowhere." The State asked if she could be fair in a case involving the Seattle

Police Department, and she said that she could. Moore indicated that he might have an objection to Juror 12:

> MR. MOORE: Excuse me, Your Honor?
>
> THE COURT: Yes, sir.
>
> MR. MOORE: She just—she just implied herself as being impliedly biased, maybe, toward me because she used the word "African American," and I'm [B]lack.
>
> THE COURT: Okay.
>
> MR. MOORE: I'm African American.
>
> THE COURT: We will deal with excusals of jurors on the break. . . . So make a list and keep—keep it in mind.

The State then turned to Juror 22, who indicated that his best friend had been attacked in his home and stabbed 45 to 50 times. He volunteered that, "I guess I would say I have extreme bias in this case because I—I thought that the person that stabbed him should have received capital punishment and he didn't. . . . I have really strong feelings behind that because, you know, it affected me emotionally." Neither party asked follow-up questions about the juror's ability to be fair, nor did the court. Juror 22 was seated and deliberated.

Moore declined to ask the panel any questions or excuse any prospective jurors during the first round of voir dire. After the State's second round of voir dire, Moore asked the venire several questions. He asked whether any prospective jurors had ties to hate groups such as the Ku Klux Klan, and one prospective juror responded that they had estranged family members with such associations. Moore asked whether anyone had experienced any racist attacks and whether they were prejudiced against people with disabilities. He also inquired about the jurors'

contact with Muslims. One prospective juror was excused on the State's motion after admitting that he grew up around people with bias against Muslims and was not sure that he could be fair. At the end of the morning session, the court explained to Moore that he would be permitted to exercise peremptory challenges and could remove up to eight jurors for no reason. Moore did not use any of his peremptory challenges.

On the day the jurors were seated, Juror 6 wrote an email to the court explaining that her religious beliefs would not permit her to pass judgment on Moore. She also voiced concerns that Moore did not appear to understand the process and "his poor understanding will result in this trial being unfair," specifically mentioning his failure to excuse Juror 22, the juror who had admitted to bias based on his friend's stabbing. Juror 6 was called in for questioning and excused.

After the juror's excusal, the court noted "for the record that there appear to be four persons of color on the jury." Moore took issue with this remark, leading to the following exchange:

> MR. MOORE: Why you point—which one is that? Four person of color or something you said?
>
> THE COURT: Yes, on the jury.
>
> MR. MOORE: What's that got to do with the jury? I didn't—I didn't—
>
> THE COURT: No, it's strictly for the appellate record. If there is to be a conviction and if there is to be an appeal, then it's important for that be—for that to be on the record.
>
> MR. MOORE: Objection to that remark. That's a remark of—that's—that is a prejudicial remark against me because I didn't—I never brought up an—an object about the jury's being color or whatever.
>     I didn't even—I didn't even use my peremptory challenges to get rid of a juror, because I want them to feel like I'm not being

- 10 -

prejudiced toward them, even when their—they had a [B]lack guy stabbed a friend or something, whatever, I didn't say nothing at all, period. I wanted them not to feel like I'm prejudiced or anything.

Moore explained in his opening statement that he intended to "prove the fabrication of this attack" but stated, "My whole goal here is not even—it might sound kind of weird. It's not even to bring you over into a finding of guiltiness [sic] or not guilty. It's to try to bring people up out of their racism that they [are] subconsciously trapped in, stuck in." Moore testified in his own defense over the course of three days, asserting that he was the victim of a race-based conspiracy involving the Seattle Police and King County prosecutors and judges. The court barred Moore from further direct examination of himself on the third day after Moore refused to follow the court's limitations on his testimony.

The jury found Moore guilty as charged. He received a high-end standard range sentence of 254 months imprisonment plus a 24-month deadly weapon enhancement for a total sentence of 278 months. Moore appealed.

ANALYSIS

I.      Waiver of Counsel

Moore first contends that the trial court violated his rights to counsel and due process in determining that his waiver of counsel was valid because it failed to consider his mental illness and the court's prior denial of his motion to represent himself.

The Washington Constitution and the United States Constitution guarantee a criminal defendant the right to self-representation. WASH. CONST. art. I, § 22; Faretta v. California, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

In Faretta v. California, the United States Supreme Court observed that "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." 422 U.S. at 817. The Washington Supreme Court has remarked that "[t]his right is so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." State v. Madsen, 168 Wn.2d 496, 503, 229 P.3d 714 (2010).

The Faretta Court acknowledged that there is an inherent tension between the right of self-representation and the guaranty of counsel. 422 U.S. at 833–34. However, the Court noted that the right to counsel did not necessarily mean that "a State may compel a defendant to accept a lawyer he does not want." Id. at 833. Despite the advantages of representation, the defendant's choice is paramount:

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."

Id. at 834 (quoting Illinois v. Allen, 397 U.S. 337, 350–51, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (Brennan, J., concurring)).

To balance the right of self-representation with a defendant's fundamental right to a fair trial, the <u>Faretta</u> Court held that the waiver of the right to counsel must be made "knowingly and intelligently[:]"

> Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."

<u>Id.</u> at 835 (quoting <u>Adams v. United States ex rel. McCann</u>, 317 U.S. 269, 63 S. Ct. 236, 87 L. Ed. 268 (1942)). Therefore, when a request to proceed pro se is unequivocal and timely, the trial court must determine whether the defendant's request is voluntary, knowing, and intelligent. <u>Madsen</u>, 168 Wn.2d at 504. The court must "'indulge in every reasonable presumption' against a defendant's waiver of his or her right to counsel." <u>In re Det. of Turay</u>, 139 Wn.2d 379, 396, 986 P.2d 790 (1999) (quoting <u>Brewer v. Williams</u>, 430 U.S. 387, 404, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)). However, "[t]he grounds that allow a court to deny a defendant the right to self-representation are limited to a finding that the defendant's request is equivocal, untimely, involuntary, or made without a general understanding of the consequences." <u>Madsen</u>, 168 Wn.2d at 504–05.

The determination of whether a defendant has validly waived their right to counsel is within the discretion of the trial court. <u>State v. Hahn</u>, 106 Wn.2d 885, 900, 726 P.2d 25 (1986). "A decision on a defendant's request for self-representation will therefore be reversed only if the decision is 'manifestly unreasonable,' relies on unsupported facts, or applies an incorrect legal standard." <u>State v. Coley</u>, 180 Wn.2d 543, 559, 326 P.3d 702 (2014) (quoting <u>Madsen</u>, 168

Wn.2d at 504). Appellate courts "give great deference to the trial court's discretion because the trial court is in a favorable position to the appellate courts in evaluating a request to proceed pro se." State v. Burns, 193 Wn.2d 190, 202, 438 P.3d 1183 (2019). In general, "[t]rial judges have more experience with evaluating requests to proceed pro se and have the benefit of observing the behavior, intonation, and characteristics of the defendant during a request." Id. On appeal, the defendant bears the burden of proof to show that their right to counsel was not competently and intelligently waived. Hahn, 106 Wn.2d at 901.

The defendant's capacity to waive counsel is distinct from the defendant's competence to stand trial:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings. . . . The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.

Godinez v. Moran, 509 U.S. 389, 401 n.12, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993) (emphasis in original). In Indiana v. Edwards, the United States Supreme Court considered the effect of this distinction on a defendant's right to self-representation and stated that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under Dusky[2] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." 554 U.S. 164, 178, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008) (alterations in original). The Court did not define "severe mental illness" but found that a defendant with "serious thinking

---

[2] Dusky v. United States 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960).

difficulties and delusion," inability "to cooperate with his attorney in his defense because of his schizophrenic illness," and "marked difficulties in thinking" could be prevented from waiving his right to counsel. Id. at 167–68 (internal quotation marks omitted).

The Washington Supreme Court has also acknowledged that a trial court may "limit the right to self-representation when there is a question about a defendant's competency to waive counsel or to act as his own counsel, even if the defendant has been found competent to stand trial." In re Pers. Restraint Pet. of Rhome, 172 Wn.2d 654, 661–62, 260 P.3d 874 (2011). "In considering whether a defendant whose competency is in question is capable of making a knowing and intelligent waiver, a trial court considers the background, experience, and conduct of the accused, which may include a history of mental illness." Id. at 663. The Rhome court emphasized that Edwards does not require trial courts to evaluate a defendant's mental health status to secure a valid waiver of counsel; it is "but one factor a trial court may consider in determining whether a defendant has knowingly and intelligently waived his right to counsel." Id. at 665. In so holding, the court made clear that, although mental health issues could be relevant to a knowing and intelligent waiver, "this does not translate into a heightened standard for waiver of counsel and pro se representation when there are mental health issues present." Id. at 666.

Moore argues that Judge O'Donnell abused his discretion in allowing Moore to represent himself because "due process required the court to consider Moore's mental illness, and the court's own prior ruling, in determining whether Moore's

waiver of counsel was valid." He contends that the court's waiver colloquy was inadequate, resulting in an erroneous determination that Moore's waiver of counsel was knowing, voluntary, and intelligent. And he argues that, "[w]here there is no showing that circumstances have changed" since an earlier denial of a motion to waive counsel based on a lack of capacity, the requirement that the trial court engage in "'every reasonable presumption' against waiver must include consideration of a prior finding by the superior court that the defendant's waiver was invalid based on mental capacity concerns."

Under Rhome, a superior court's prior finding that a waiver of counsel was invalid based on the defendant's mental health is simply another factor that a court may consider when determining whether a pending waiver is knowing and intelligent. Moore had been found competent to stand trial and, although the court did not make specific findings regarding his diagnosis, it credited the testimony of experts who opined that Moore did not suffer from any psychotic disorder. As the State noted at oral argument, Moore does not point to any authority for the proposition that a personality disorder renders a defendant incapable of exercising their right to self-representation. Moore's argument does not account for the inherently fluid nature of both mental health and the attorney-client relationship. These factors are not fixed and stagnant. A defendant with a personality disorder may present very differently to the court at different points in time, even without a change in circumstances. Similarly, the attorney-client relationship may strengthen, deteriorate, or simply carry on without issue as a case progresses. It is within the court's discretion to take a fresh look at all of these factors and

determine how they affect a defendant's ability to understand the consequences of a waiver of counsel.

Here, the record indicates that Judge O'Donnell had at least briefly reviewed Judge Roberts' previous order denying Moore's request to represent himself. As the State points out, Judge O'Donnell had observed and interacted with Moore over the course of multiple hearings, had read Moore's repeated motions to waive counsel, and was aware that Moore's mental health was an ongoing concern. Judge O'Donnell also engaged in a lengthy colloquy with Moore, confirming that he understood the consequences of his request to represent himself and emphasizing the standard to which he would be held as a pro se participant. After conducting this inquiry, the court concluded that Moore's waiver was unequivocal, timely, voluntary, knowing, and intelligent. The court did not abuse its discretion in allowing Moore to represent himself.

II.     Juror Bias

Moore also argues that reversal is required because the trial court failed to excuse a juror who expressed potential bias. The State responds that the record does not demonstrate the juror's actual bias, that Moore invited or failed to preserve any error by failing to request the removal of Juror 22 from the jury, and that the trial court would risk violating Moore's Faretta rights by intervening in his jury selection strategy. Appellate courts review a trial court's failure to dismiss a juror for bias for an abuse of discretion. State v. Guevara Diaz, 11 Wn. App. 2d 843, 856, 456 P.3d 869 (2020).

We will consider an issue not raised in the trial court if it involves manifest constitutional error. RAP 2.5(a)(3). A criminal defendant has a constitutional right to a fair and impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "[I]f the record demonstrates the actual bias of a juror, seating the biased juror was by definition a manifest error" requiring reversal, regardless of a defendant's failure to challenge the juror for cause at trial. State v. Irby, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015).

"Actual bias is 'the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.'" Id. (quoting RCW 4.44.170(2)). The record must demonstrate a probability of actual bias; a mere possibility of bias or an equivocal expression of bias is not sufficient. State v. Sassen Van Elsloo, 191 Wn.2d 798, 808–09, 425 P.3d 807 (2018).

Here, the State has the better argument because the record does not demonstrate a probability of actual bias. As the State points out, Juror 22 did not make an unequivocal statement that he could not be fair in deciding this case. The juror's assertion that "I guess I would say I have extreme bias" was volunteered as he was describing his friend's attack and was not given in response to any question regarding whether the incident would affect his ability to be fair. Neither party nor the judge followed up with questioning, suggesting that the juror's tone and demeanor did not raise concern of actual bias. These considerations indicate that the juror's statement was more equivocal that it may seem on its face.

Also, Juror 22's chief objection to his friend's situation concerned the sentence that the assailant received. Moore presented a defense of identity, denying that he had stabbed Cross, rather than arguing any justification for the stabbing. At best, Juror 22's statement suggests bias against those who stab others. Moore denied that he belonged to that class. Although Juror 22 might have been biased against Moore after determining that he had stabbed someone, there is no indication that he would be unable to weigh the evidence or make that determination fairly.

Because Moore has not shown a probability of actual bias, he has not shown a manifest constitutional error that may be raised for the first time on review.[3]

Affirmed.

WE CONCUR:

_____  Mann, C.J.

_____  Dwyer, J.

---

[3] Moore submitted a pro se statement of additional grounds for review in which he raises broad allegations of racism and governmental misconduct. However, because the statement does not adequately inform us of the nature and occurrence of the alleged errors and appears to involve facts or evidence not in the record, these issues are properly raised through a personal restraint petition, not a statement of additional grounds. See State v. Calvin, 176 Wn. App. 1, 26, 316 P.3d 496 (2013).

Moore additionally sent two letters to this court that were received on April 12, 2021 and April 22, 2021, each of which contained similar allegations regarding the verbatim report of proceedings prepared for this appeal. In the absence of a specific request for relief or supporting authority, we are unable to address this issue. Moore may also wish to include this issue in his personal restraint petition.