# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56615-0-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| RODNEY RAY DOTSON, | |
| Appellant. | |

CHE, J.—Rodney Dotson appeals his convictions for multiple counts of rape of a child and child molestation. He argues that (1) he was denied his right to a fair trial by an impartial jury, (2) his attorney was ineffective in failing to object to inadmissible hearsay, (3) the trial court erred in imposing an exceptional sentence based on an aggravating factor that is inseparable from the elements of the convictions, and (4) the trial court erred in ordering that Dotson refrain from mind- or mood-altering substances as a condition of his community custody.

We hold that (1) the trial court did not err in failing to excuse three jurors in the absence of actual bias, (2) Dotson was not prejudiced by his counsel's alleged failure to object to inadmissible hearsay, (3) the trial court did not err in imposing an exceptional sentence, but (4) the trial court exceeded its authority in requiring that Dotson refrain from mind- or mood-altering substances. Consequently, we affirm Dotson's conviction and exceptional sentence, but we remand for the trial court to strike Dotson's community custody condition concerning mind- or mood-altering substances.

FACTS

In 2005, Dotson and LJM's mother started dating. In 2006, Dotson moved in with LJM's mother, LJM, and LJM's sister. LJM "viewed [Dotson] as a father figure." 3 Rep. of Proc. (RP) (Aug. 4, 2021) at 409. Between 2010 and 2017, Dotson and LJM's family moved into three different residences. LJM disclosed that Dotson sexually abused LJM in each residence. In 2019, the State charged Dotson with multiple counts of child sex offenses occurring between 2012 to 2017.[1]

A.      *Incidents of Sexual Abuse*

LJM testified that the first instance of abuse happened in the fifth grade. Dotson "rubbed" LJM's legs before using his finger to rub and penetrate LJM's vagina. 3 RP at 387-88. Dotson "would touch [LJM] inappropriately" in public, snapping LJM's bra and grabbing LJM's breasts. 3 RP at 389. There were "one or two incidents where [Dotson] used his penis to mess with" LJM's breasts. 3 RP at 390. Dotson touched LJM's breasts during "almost every incident" of sexual interaction. 3 RP at 391. Dotson penetrated LJM's vagina "[m]ore than once." 3 RP at 393. There were "a couple incidents where [Dotson] used sex toys" to penetrate LJM's vagina. 3 RP at 391.

LJM explained that the abuse continued each time the family moved into a new residence. LJM described not being able to "remember a full school year where no incidents happened." 3 RP at 406. LJM recalled Dotson continued to grab LJM's breasts but LJM could

---

[1] Count 10 allegedly occurred in 2019, but it was dismissed after the convictions on counts 1 through 9.

not "remember a specific number" of times. 3 RP at 394. LJM recalled being vaginally penetrated by Dotson frequently and in each of the three residences the family lived in. Also, during sophomore year, LJM "remember[ed] getting a partner and asking [Dotson] to stop these different incidents." 3 RP at 408. LJM recalled that Dotson agreed to stop but said "[j]ust remember, at the beginning you said it's okay, so it's okay." 3 RP at 408.

Initially, LJM did not tell anyone about Dotson's behavior. However, in 2016, LJM confided in SN. SN, her sister, and her mother lived with Dotson and LJM's family. SN explained that LJM told her that LJM "had been sexually assaulted." 3 RP at 459. SN told LJM that they "should tell people, and that [LJM] should have [Dotson] reported." 3 RP at 459.

In June 2019, LJM told therapist, Tanya Lyon, about "a friend named Lily who was being molested by a family member." 3 RP at 373. LJM explained that "Lily was starting to realize that what was happening to her was not okay and that she might want to talk to somebody about it." 3 RP at 374. Lyon explained that LJM's references to Lily was actually about LJM. Lyon recalled that LJM told Lyon "that [LJM's] stepdad, Rod, had been having sex with [LJM], raping [LJM] since [LJM] was 11." 3 RP at 375-76. Lyon explained that LJM "was working through the lies that [Dotson had] told [LJM], that [LJM] was understanding that [LJM] was not old enough to give consent, and that what [Dotson] did was not okay." 3 RP at 376. Lyon explained that, in cases of sexual abuse, it is important to learn the identity of the abuser because Lyon is "required, by law, to report abuse if [she] can." 3 RP at 371. In describing whether an abuser's identity is an important part of the therapeutic intervention, Lyon explained that "[i]t kind of

3

depends.  Because [she is] not a specialist in certain areas of abuse, it's important that [she] would refer to a person who was a specialty provider."  3 RP at 371.

Prior to LJM's admission, Lyon had been working with LJM since 2017 on "transitional communication issues with her family, having coparents, and a lot of symptoms of anxiety."  3 RP at 371.  Lyon described LJM's symptoms as including "avoidance, fearfulness, all the symptoms of anxiety," nightmares, timidity, "perseverating on things," and LJM's lack of trust.  AR at 371-72.  Following LJM's admission, Lyon worked with LJM to explore LJM's emotions, fears around relationships, and "healthy versus unhealthy relational patterns."  3 RP at 376.  Lyon further engaged LJM in supportive reflection, "cognitive processing and interactive feedback."  3 RP at 376.

In August 2019, LJM told LJM's mother "that [LJM] had been molested and raped."  3 RP at 445.  LJM subsequently spoke with Officer Brown.  Officer Brown explained that LJM told her "that Rodney had had sex with her and had touched her inappropriately."  3 RP at 471.  Although initially hesitant, LJM agreed "to do a phone tip" in which Brown listened "on the same receiver to a phone call" between LJM and Dotson.  3 RP at 472-73.  Brown stated that during the call, LJM told Dotson "that [LJM] had been talking to a counselor about the sex thing."  3 RP at 473.  Brown explained that Dotson "said that he knew what he did was irresponsible and selfish, and that" he would go to jail if LJM talked to LJM's mother.  3 RP at 477.  Dotson was arrested when he returned to the residence.

Subsequent to reporting Dotson to Brown, LJM met with sexual assault nurse examiner, Lisa Wahl.  Wahl explained that LJM told Wahl "that it was her mom's boyfriend and that he

had been sexually abusing her since she was 11 years old -- at the time that [Wahl] met [LJM], she was 17." 4 RP (Aug. 5 2021) at 530. Wahl explained that in cases of sexual assault, the identity of the alleged abuser is necessary for making follow-up treatment recommendations. Wahl explained that if

> a child is living with her abuser, or his abuser, it sets up a chronic trauma state for that child's brain. If the abuser . . . has made any sorts of manipulative or exploitive or threats or concerns to the child, that may impact a child's ongoing mental health status, ability to talk about what's happened to them, ability to feel safe in their world, the ability to be able to trust that they can leave their home . . . and know that they will be safe.

4 RP at 527-28.

B.    *Motions in Limine*

Before jury selection, the trial court addressed defense counsel's motion to exclude LJM's statements that were made in medical and psychotherapy reports. Defense counsel explained that LJM's statements to Wahl and Lyon should be excluded because they were not made for purposes of medical diagnosis or treatment. Defense counsel argued that LJM's statements to Wahl were made as part of the law enforcement process. Defense counsel further explained that LJM was not seeing Lyon because of Dotson, but that LJM was seeking therapy because LJM "had other issues beforehand." 1 RP (Aug 2, 2021) at 29.

In addressing defense counsel's arguments, the trial court explained that if Wahl's testimony was what the court was expecting it to be then it would "allow the testimony and find that it comes within the hearsay exception . . . 803(a)(4)." 1 RP at 33. In regards to Lyon, the trial court found "that the anticipated testimony would also come within the [hearsay] exception." 1 RP at 33. The trial court denied the defense's motions, but noted "that if what [the

court was] anticipating turns out to not be the testimony provided in foundation, then the defense motion may be renewed." 1 RP at 33.

During trial, defense counsel did not renew its motion or object following Lyon's testimony that LJM revealed "that [LJM's] stepdad, Rod, had been having sex with [LJM], raping [LJM] since [LJM] was 11." 3 RP at 375-76. Defense counsel did object to the State's question about what LJM had told Wahl "about any concerns or worries that [LJM] had about [LJM] or [LJM's] body during the medical history component of the exam." 4 RP at 530. Defense counsel explained that Wahl had "already indicated what the actual complaint was, the dates of the complaint," and who was involved. 4 RP at 531. Defense counsel argued that anything beyond that information went "beyond the scope of the motions in limine." 4 RP at 531. The trial court sustained defense counsel's objection.

C.      *Voir Dire*

On the first day of voir dire, defense counsel asked the jury panel, "Who would have difficulty with this case just because of the charges alone?" 1 RP at 146. Prospective juror 10 raised their hand in response to counsel's question. Prospective juror 10 explained:

> My wife's been a supervisor for a -- she's a social worker supervisor and she works real -- for about 40 years has been working with DSHS and Child Protective Services for many, many years and she teaches classes and things like that, and I don't know if I can really be 100 percent biased [sic]. I mean, I have some biases because of her talking over certain things that she's learned over 40 years of being in the field.

1 RP at 146-47. When defense counsel asked whether prospective juror 10 had "bias at this time regarding one side or another," the following exchange occurred:

> Prospective Juror No. 10: Yes.
>
> [Defense Counsel]: And that would be what, sir?
>
> Prospective Juror No. 10: It's almost always the males.
>
> [Defense Counsel]: So right now you have a bias, believing that my client is guilty of something?
>
> Prospective Juror No. 10: Yes.
>
> [Defense Counsel]: And do you think that would interfere with your ability to be an unbiased juror?
>
> Prospective Juror No. 10: It depends on how the case is presented, I would presume. Hopefully I'm a fair person.

1 RP at 147. After excusing the jury panel, the trial court asked whether counsel had "any motions for excusing any jurors" and defense counsel replied that they did not. 1 RP at 161.

On the second day of voir dire, the State asked the jury panel about "the first thing that went through their mind when they heard" the charges. 2 RP (Aug. 3, 2021) at 255. Prospective juror 30 replied that they were "[d]isgusted." 2 RP at 255. Prospective juror 30 explained that "[i]t's just a heinous crime." 2 RP at 255.

During subsequent questioning, defense counsel inquired whether prospective juror 41 "already [had] a particular type of bias." 2 RP at 275. Prospective juror 41 responded "[y]eah, yeah, definitely" in favor of the State. 2 RP at 275. Defense counsel asked if "[a]nybody else [had] that bias" and prospective juror 30 raised their hand. 2 RP at 275. Prospective juror 30 explained "I don't know. I'm on the fence." 2 RP at 276. Prospective juror 31 agreed, stating "I was on the fence too on the question." 2 RP at 276. Defense counsel questioned prospective juror 31 further:

> [Defense Counsel]: 31. So would it be fair to say that you would prefer to be in a different type of trial, number 31?
>
> Prospective Juror No. 31: Me? Yeah, I guess when I heard the initial allegations and everything, it just kind of threw me into like, oh, my goodness, and, you know,

7

that's something that's -- again, it's -- I don't - I don't know if it just instantly makes you think. Again, you have to see all the evidence, of course. But I don't know. I don't know. I just . . .

2 RP at 276.

After excusing the jury panel, defense counsel moved to excuse prospective jurors 30 and 31. Defense counsel explained that prospective jurors 30 and 31, among others, "indicated they're already biased towards the State." 2 RP at 284. Defense counsel acknowledged that the jurors "didn't say anything in particular," but that when "asked the general question of who's already biased to the State based on the charges . . . all these individuals did raise their hand." 2 RP at 285. The State argued that prospective jurors 30 and 31 "indicated that they were sort of on the fence about whether or not they're biased one way or another" but that "they ultimately indicated that they would have to see the evidence." 2 RP at 286. The trial court denied defense counsel's motion to excuse prospective jurors 30 and 31.

Prospective jurors 10, 30, and 31 served on the jury.

D.      *Trial Testimony*

At trial, LJM, SN, Lyon, Officer Brown, and Wahl testified to the facts above.

Dotson admitted to having sexual contact with LJM. Dotson explained that in January 2016, LJM had "pressed [LJM's] breasts against [Dotson's] shoulder" prompting Dotson to ask LJM if LJM wanted "to fool around." 4 RP at 570. Dotson alleged that LJM shrugged and eventually joined him on the bed. Dotson described having put his hand on LJM's legs, "perform[ing] oral sex on [LJM]," and penetrating LJM's vagina. 4 RP at 570. Dotson denied ever having sexual contact with LJM after this incident.

8

E.      *Verdict and Sentencing*

In 2021, a jury convicted Dotson of two counts of first degree rape of a child, two counts of first degree child molestation, two counts of second degree rape of a child, one count of second degree child molestation, one count of third degree rape of a child, and one count of third degree child molestation.  The jury found by separate, special verdicts that the crime in each count was "part of an ongoing pattern of sexual abuse of the same victim under the age of 18 years manifested by multiple incidents over a prolonged period of time."  6 RP (Aug. 9, 2021) at 725.

In addition to the aggravating factor found by the jury, in the trial court's findings of fact and conclusions of law supporting an exceptional sentence, the court found the additional aggravating factor that Dotson "has committed multiple current offenses and [his] high offender score results in some of the current offenses going unpunished, is applicable."  Clerk's Papers (CP) at 105.

At sentencing, the court explained that it

does find that in light of the offender score, the number of convictions, the jury's special verdict forms for all nine convictions, that the standard sentence even at the top end does not sufficiently account for the crimes. The court finds that the proposal from the state in terms of how to approach a sentence that accounts for the crimes and doesn't have free crimes or unsentenced crimes, if you will, is an appropriate way to approach the specific crimes in this case and the court is making a finding that it is appropriate to depart from the guidelines find aggravating circumstances including that the defendant knew or should have known that the victim was particularly vulnerable as well as the finding by the jury in each of the special verdict forms.

RP (Jan. 4, 2022) at 21.

9

Accordingly, the trial court imposed an exceptional sentence of 408 months to life on counts 1 and 2. The court imposed the high end of the standard sentencing range on the remaining counts—198 months to life on counts 3 and 4, 280 months to life on counts 5 and 6, 116 months on count 7, and 60 months on counts 8 and 9.[2] The trial court imposed a community custody term requiring Dotson to "not possess or consume any mind or mood altering substances." CP at 132.

Dotson appeals.

## ANALYSIS

### I. JUROR BIAS

Dotson argues that he "was denied his constitutional right to a fair trial by an impartial jury" because prospective jurors 10, 30, and 31 were not dismissed. Br. of Appellant at 12. Dotson contends that his "convictions must be reversed because . . . three jurors' statements showed actual bias in violation of [his] right to an impartial jury." Br. of Appellant at 13. We disagree.

Criminal defendants have a constitutional right to a fair and impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Irby*, 187 Wn. App. 183, 192, 347 P.3d 1103 (2015). The seating of a biased juror violates this right. *Irby*, 187 Wn. App. at 193. Protecting this right requires that a juror be excused if the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his or her instructions and his

---

[2] Dotson's judgment and sentence reflects the sentences above, but in the exceptional sentence paragraph, it notes only an exceptional sentence on count 1, and does not include count 2. This is not raised in the appeal and may be addressed on remand.

or her oath." *State v. Winborne*, 4 Wn. App. 2d 147, 160, 420 P.3d 707 (2018). The "trial court is in the best position to determine a juror's ability to be fair and impartial" because the trial court "can observe the demeanor of the juror and evaluate" their responses. *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991).

Under RCW 4.44.170(2), actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." The statute further provides that if it appears "that the juror challenged has formed or expressed an opinion . . ., such opinion shall not of itself be sufficient to sustain the challenge." RCW 4.44.190. Instead, "the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190.

A trial court should exercise caution before sua sponte injecting itself into the jury selection process. *State v. Lawler*, 194 Wn. App. 275, 284, 374 P.3d 278 (2016). "[T]rial counsel may have legitimate, tactical reasons not to challenge a juror who may have given responses that suggest some bias." *Id.* at 285.

A.     *Prospective Juror 10*

Dotson argues that prospective juror 10 "affirmed several times that he was biased against Dotson," and "failed to provide a subsequent assurance of impartiality." Br. of Appellant at 15. Dotson argues that the trial court "had an obligation either to excuse [prospective juror 10] or to inquire further." Br. of Appellant at 17.

Even where a party does not move to strike a juror, "a trial court must do so on its own motion where grounds for a challenge for cause are apparent in the record." *State v. Gutierrez*, 22 Wn. App. 2d 815, 820, 513 P.3d 812 (2022). Under RCW 2.36.110, the trial court has a duty "to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias [or] prejudice." *Id.* We review a trial judge's failure "to inquire further or excuse [a] juror sua sponte" for abuse of discretion. *Gutierrez*, 22 Wn. App. 2d at 822.

Dotson analogizes prospective juror 10's statements to those that led to reversal in *Irby*. In *Irby*, the trial court asked a prospective juror whether they "could listen to both sides, listen to the whole story." 187 Wn. App. at 190. The prospective juror stated that she "would like to say [the defendant is] guilty." *Id.* There was no individual follow up questioning about the prospective juror's statement. *Id.* Instead, the State asked the panel "generally: 'Does everybody here think that they can basically make a finding of guilty or not guilty based on the evidence that you hear?'" *Id.* at at 196. None of the potential jurors, including the challenged juror, responded to the State's general question. *Id.* The prospective juror served on the jury. *Id.*

On appeal, this court held that the juror had demonstrated actual bias requiring reversal. *Id.* at 197. The court explained that there had been no attempt to neutralize the juror's statements or to elicit assurances that the juror had an open mind concerning guilt. *Id.* at 188. Furthermore, the court clarified that a question directed towards the panel "cannot substitute for individual questioning of a juror who has expressed actual bias." *Id.* at 196. As a result, the court held that

"seating the juror is a manifest constitutional error," and that the defendant was entitled to a new trial. *Id.* at 188.

*Irby* is unique because the defendant waived both his rights to counsel and to be present. *Id*. As a result, "the trial proceeded before a jury that had been picked without any participation by Irby." *Id.* at 189. On appeal, the court noted that "the trial judge and the prosecutor knew that Irby's refusal to participate did not excuse them from the duty of impaneling a fair and impartial jury." *Id.* at 196.

Here, prospective juror 10's statements contain equivocation and prospective juror 10 was not challenged for cause. During voir dire, prospective juror 10 indicated that he would have difficulty serving in this case because of the charges. Prospective juror 10 explained that his wife had worked for Child Protective Services for over 40 years and that as a result he did not know if he could "really be 100 percent" unbiased. 1 RP at 147. Defense counsel asked whether prospective juror 10 had any bias "regarding one side or another" and prospective juror 10 explained:

> Prospective Juror No. 10: Yes.
> [Defense Counsel]: And that would be what, sir?
> Prospective Juror No. 10: It's almost always the males.
> [Defense Counsel]: So right now you have a bias, believing that my client is guilty of something?
> Prospective Juror No. 10: Yes.
> [Defense Counsel]: And do you think that would interfere with your ability to be an unbiased juror?
> Prospective Juror No. 10: It depends on how the case is presented, I would presume. Hopefully, I'm a fair person.
> [Defense Counsel]: Okay.

1 RP at 147.

Prospective juror 10's responses do not evidence a firm bias. Instead, prospective juror 10's responses indicate that he was uncertain whether he could be "100 percent" unbiased. Prospective juror 10 explained that his ability to be an unbiased juror was dependent "on how the case [was] presented." 1 RP at 147. Prospective juror 10's statements evidence a juror who is aware of their bias but who aspires to be fair and is attentive to how the case is presented. Defense counsel did not challenge for cause prospective juror 10 and there is no record that shows that defense counsel's decision was not strategic. *Lawler*, 194 Wn. App.at 285. In light of no defense challenge for cause, prospective juror 10's equivocal answer, and recognizing the trial court's advantage in being able to evaluate prospective juror 10, we hold that the trial court did not abuse its discretion in not excusing prospective juror 10 sua sponte.

B.      *Prospective Jurors 30 and 31*

Dotson argues that prospective jurors 30 and 31 demonstrated actual bias and the trial court "erred in denying Dotson's motions to excuse them for cause." Br. of Appellant at 18. Dotson argues that "[n]othing in the exchanges with jurors 30 and 31 rehabilitated their understanding of the presumption of innocence or willingness to follow the court's instructions." Br. of Appellant at 19.

In determining whether to sustain a juror challenge, trial courts possess broad discretion. *Irby*, 187 Wn. App. at 193. Denial of a challenge for cause "will not constitute reversible error absent a manifest abuse of that discretion." *Noltie*, 116 Wn.2d at 838.

Here, the trial court did not err in denying Dotson's motions to excuse prospective jurors 30 and 31 because the jurors did not demonstrate actual bias. Initially, prospective jurors 30 and

14

31 indicated their agreement with another prospective juror's statement of bias in favor of the State. But in response to subsequent questioning, both prospective jurors admitted to "being on the fence" about their feelings of potential bias. 2 RP at 276. Prospective juror 31 further explained that they would "have to see all the evidence, of course." 2 RP at 276. In moving to excuse prospective jurors 30 and 31, defense counsel admitted that the challenged jurors "didn't say anything in particular" to evidence actual bias. 2 RP at 285. Instead, defense counsel argued that bias was evidenced by the jurors raising their hand in response to counsel's question of "who's already biased to the State." 2 RP at 285. In light of prospective jurors 30 and 31's statements concerning "being on the fence," and prospective juror 31's statement of needing to see the evidence, we hold that the trial court did not err in denying Dotson's motion to excuse prospective jurors 30 and 31.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Dotson argues that trial counsel was ineffective for failing to renew the pretrial objection to LJM's out of court statements to Lyon "because [the statements identifying Dotson] were not made for purposes of medical diagnosis or treatment" and were therefore inadmissible hearsay. Br. of Appellant at 20. It appears that Dotson challenges the admission of counselor Lyon's statement that LJM "told [Lyon] that her stepdad, Rod, had been having sex with her, raping her since she was 11." 3 RP at 375-76. Dotson further contends that counsel's "failure to object to inadmissible hearsay contributed to the repetition of the complainant's accusations," undermining confidence in the proceeding's outcome. Br. of Appellant at 26. We disagree.

15

State and federal constitutions guarantee criminal defendants the right to effective assistance of counsel. *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). A successful ineffective assistance of counsel claim requires "'two showings: (1) defense counsel's representation was deficient, . . .; and (2) defense counsel's deficient representation prejudiced the defendant.'" *Id.* at 247-48 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Because a successful ineffective assistance of counsel claim requires that "both prongs must be met, a failure to show either prong will end [our] inquiry." *State v. Davis*, 174 Wn. App. 623, 639, 300 P.3d 465 (2013).

Performance is deficient when "'it [falls] below an objective standard of reasonableness based on consideration of all the circumstances.'" *Vazquez*, 198 Wn.2d at 247-48 (quoting *McFarland*, 127 Wn.2d at 335). Counsel's "failure to object to inadmissible evidence" is deficient performance. *Id.* at 269. However, deficient performance cannot be premised on conduct that may be characterized as trial strategy or tactics. *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996).

This court gives great deference to trial counsel's performance and begins its analysis with a strong presumption that counsel was effective. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *McFarland*, 127 Wn.2d at 335.

Deficient performance is prejudicial where "'there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Vazquez*, 198 Wn.2d at 248 (quoting *McFarland*, 127 Wn.2d at 335). This court "need not

16

determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

"Hearsay" is an out of court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). Generally, hearsay evidence is not admissible unless it falls within an exception. ER 802. ER 803(a)(4) provides a hearsay exception for statements "made for purposes of medical diagnosis or treatment . . . insofar as reasonably pertinent to diagnosis or treatment." A statement is "reasonably pertinent" to diagnosis or treatment when "(1) the declarant's motive in making the statement is to promote treatment, and (2) the medical professional reasonably relied on the statement for purposes of treatment." *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007).

Here, we need not address the parties' arguments about whether LJM's out of court statement was inadmissible hearsay because even if Dotson's counsel was deficient in failing to object to its admission, Dotson cannot show prejudice.

LJM's challenged out of court statement to counselor Lyon was not the only evidence that identified the acts, identified Dotson as the abuser, and identified a period of time of abuse. Over the course of LJM's testimony, LJM detailed Dotson's abuse as occurring in three residences, beginning in the 5th grade and persisting until the 10th grade. LJM's mother testified that in 2019, LJM admitted that "[LJM] had been molested and raped." 3 RP at 445. SN testified that in 2018, she learned that LJM "had been sexually assaulted." 3 RP at 459. Officer Brown testified that LJM disclosed "that Rodney had had sex with [LJM] and had touched [LJM] inappropriately." 3 RP at 471. During the phone tip, Dotson made incriminating

statements. Nurse Wahl testified that LJM discussed being sexually abused and that LJM told her "that it was her mom's boyfriend and that he had been sexually abusing her since she was 11 years old—at the time that [Nurse Wahl] met [LJM], she was 17." 4 RP at 530. Most significantly, in his own testimony, Dotson admitted to having sexual contact with LJM on one occasion.

In light of extensive witness testimony showing that Dotson raped and molested LJM on multiple occasions, there is no reasonable probability that without LJM's out of court statement to counselor Lyon, the result of the proceeding would have been different. Accordingly, we hold that Dotson's trial counsel was not ineffective in failing to renew the pre-trial objection to the introduction of LJM's out of court statement.

### III. EXCEPTIONAL SENTENCE

Dotson argues that the trial court erred in imposing an exceptional sentence based on facts inherent to the convictions. Dotson contends that the jury "was not instructed that it could not find an aggravating factor based on the same acts underlying the guilty verdicts on the offenses themselves" and thus, there "is no way to know which acts the jury relied on to find a pattern when rendering its special verdict on the aggravating factor." Br. of Appellant at 30. Dotson argues that because "there is no way to know which [acts] the jury relied on, the verdict is ambiguous." Br. of Appellant at 31. We disagree.

Under RCW 9.94A.535, a sentencing court "may impose a sentence outside the standard sentence range for an offense if it finds . . . that there are substantial and compelling reasons justifying an exceptional sentence." A sentencing court "may impose an aggravated exceptional

sentence without a finding of fact by a jury" if the "defendant has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished." RCW 9.94A.535(2)(c). After consideration by a jury, the court may impose an aggravated exceptional sentence if the "offense was part of an ongoing pattern of sexual abuse of the same victim under the age of eighteen years manifested by multiple incidents over a prolonged period of time." RCW 9.94A.535(3)(g).

The reasons supporting imposition of an exceptional sentence "must encompass factors other than those that are inherent to the offense and are used in computing the presumptive range for the charge." *State v. Falling*, 50 Wn. App. 47, 53, 747 P.2d 1119 (1987). Furthermore, the reasons may not "be based on facts that establish the elements of a more serious or additional crime." *Id.* (citing former RCW 9.94A.370(2))[3].

In reversing an exceptional sentence, this court must find:

(a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.585(4).

In order to "convict a defendant of a multiple acts crime, the State must elect the act on which it relies to convict the defendant, or the trial court must provide a unanimity instruction and the jury must unanimously agree as to which act constituted the crime charged." *State v.*

---

[3] Former RCW 9.94A.370(2) provides that "[f]acts that establish the elements of a more serious crime or additional crimes may not be used to go outside the presumptive sentence range except upon stipulation or when specifically provided for in RCW 9.94A.390(2)(c), (d), and (e)." Former RCW 9.94A.370(2) was recodified as RCW 9.94A.530.

*Christian*, 18 Wn. App. 2d 185, 208, 489 P.3d 657 (2021). Under the harmless error analysis, an error in jury instructions "is presumed prejudicial unless [the court] conclude[s] the error could not have rationally affected the verdict." *State v. DeRyke*, 149 Wn.2d 906, 912, 73 P.3d 1000 (2003). In *DeRyke*, the court held that "it was error to give the jury a 'to convict' instruction for the charge of attempted first degree rape which did not specify the degree of the rape allegedly committed." *Id.* Despite this error, the court, applying the harmless error analysis, affirmed the defendant's sentence because the instructions did not allow the jury an opportunity "to confuse the various degrees of rape." *Id.* at 914.

Here, the legislature specifically made committing an offense that is "part of an ongoing pattern of sexual abuse of the same victim under the age of eighteen years manifested by multiple incidents over a prolonged period of time" an aggravating factor. RCW 9.94A.535(3)(g). It follows that the elements of this aggravating factor are thus not accounted for in the standard sentencing ranges. The aggravating factor rests on multiple incidents against the same victim over a prolonged period of time. None of these factors are "inherent to the offense" of child rape or child molestation nor are they used in computing the presumptive range for the crimes of child rape or molestation. *See* RCW9A.44.073(1), RCW 9A.44.076(1), RCW 9A.44.079, RCW 9A.44.083(1), RCW 9A.44.086, RCW 9A.44.089.

Furthermore, Dotson's offender score was 24. Each of Dotson's current convictions counted as 3 points. Nothing above a score of 9 affects the standard range. *See* RCW 9.94A.510. Therefore, counts 4 through 9 were not "necessarily considered in computing the presumptive range" for counts 1 and 2 and may be used to support the exceptional sentence.

Accordingly, we hold that the trial court did not err in imposing an exceptional sentence based upon the jury special verdicts.

## V. COMMUNITY CUSTODY CONDITION

Dotson argues that the trial court "erred in requiring, as a condition of community custody, that Dotson abstain from all mind- or mood-altering substances." Br. of Appellant at 34. Dotson argues that because the condition "is unconstitutionally vague and unrelated to his convictions," the condition must be stricken. Br. of Appellant at 34.

The State concedes that "the specific language regarding mind or mood-altering substances should be stricken." Br. of Resp't at 58. We agree that the trial court erred in ordering that Dotson refrain from all mind- or mood-altering substances.

Under RCW 9.94A.703, a trial court may impose three forms of community custody conditions: mandatory, waivable, and discretionary. Unless waived, the trial court shall order an offender to "[r]efrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions." RCW 9.94A.703(2)(c). In exercising its discretion, the sentencing court may require an offender to "[c]omply with any crime-related prohibitions." RCW 9.94A.703(f). Under RCW 9.94A.030(10), a "crime-related prohibition" is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted."

We review "de novo whether the trial court had statutory authorization to impose a community custody condition." *State v. Johnson*, 180 Wn. App. 318, 325, 327 P.3d 704 (2014).

No. 56615-0-II

Here, Dotson's community custody condition prohibiting possession or consumption of "any mind or mood-altering substances" is unrelated to his convictions. The record does not suggest that mind or mood-altering substances were related to the circumstances of Dotson's convictions. Accordingly, we hold that the trial court exceeded its authority in ordering Dotson to refrain from possessing or consuming mind or mood-altering substances.

CONCLUSION

We affirm Dotson's conviction and exceptional sentence, but we remand for the trial court to strike Dotson's community custody condition concerning mind- or mood-altering substances.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Maxa, P.J.

Lee, J.

22