IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 87674-1-I |
| Respondent, | DIVISION ONE |
| v. | |
| WOO JUNG YUN, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, J. — The State charged Woo Yun with attempting to elude a pursuing police officer. During jury selection, the State asked the court to dismiss a juror for cause, expressing concern the juror had indicated bias and hesitancy toward following the instructions of the court. Yun objected, arguing the State did not meet the standard to remove the juror for cause. The court granted the State's motion and struck the juror from the jury pool. The jury then found Yun guilty.

Yun appeals, asserting the court should have denied the for cause challenge to the juror because race and ethnicity may have been a factor, that he received ineffective assistance of counsel, and that insufficient evidence supports his conviction.

Finding no error, we affirm.

FACTS

Background

In February 2023, while on patrol, Lacey Police Department Corporal Alexxi Timmons observed a maroon minivan driving at high speeds.  Corporal Timmons followed the minivan, which cut in front of her before abruptly turning left without a turn signal.  When Corporal Timmons caught up with the minivan, she activated her lights to indicate a traffic stop.  The van did not pull over; instead "screech[ing] its tires" and accelerating away.  Corporal Timmons turned on her siren and followed the minivan.

Despite the siren, the minivan still did not pull over.  Rather, the vehicle turned at another stoplight and sped away, weaving through traffic and "going so far and so fast" that Corporal Timmons could not keep up.  Following law enforcement policies regarding pursuit, Corporal Timmons deactivated her lights and siren but continued to follow the van from a distance.

Corporal Timmons lost sight of the minivan briefly, but caught up to the vehicle at a stoplight.  The minivan then made a U-turn, driving back past Corporal Timmons.  As the van passed, Corporal Timmons was able to see the driver, who she described as "a bald Asian male."  The driver made eye contact with her and smiled as he passed.

Corporal Timmons again turned on her lights to pursue the minivan but abandoned the pursuit when it drove too fast for her to follow.  She informed other officers in the area, who also began looking for the van.

Within a few minutes, Mike Traulsen, an employee at a nearby Planet Fitness, called police to report that Yun had come into the gym. Traulsen later testified that Yun came to him, told him law enforcement was chasing Yun, and asked Traulsen to call the police. Yun then said "[n]ever mind [sic]," collected his gym clothes from his van, and returned to the gym to work out.

When Corporal Timmons arrived at the Planet Fitness, she identified the maroon minivan in the parking lot. Once inside, she saw Yun entering the locker room. Corporal Timmons followed Yun into the locker room and asked if he knew why she was there. Following a defense objection during testimony, Corporal Timmons stated that Yun gave "some reasons" as to why he did not pull over. Corporal Timmons arrested Yun and searched his belongings incident to arrest.

In searching Yun's belongings, Corporal Timmons noted that the minivan was registered to Kwang Yun, Yun's father. After obtaining Kwang Yun's driver's license photo, she testified that Kwang Yun was not the person she had seen driving. She stated that, in contrast to the driver she identified as Yun, Kwang Yun was "much older and then not completely bald."

The State charged Yun with attempting to elude a pursuing police officer and witness tampering.[1] The case proceeded to trial in January 2024.

---

[1] The State added the witness tampering charge when Traulsen informed law enforcement that, while speaking briefly at the gym after the incident, Yun stated, "[j]ust don't testify against me."

## Voir Dire

During the first round of jury selection, prospective juror 2 stated that she had been a juror in a Thurston County criminal case three years earlier. When the State asked her how she felt about the jury process, she responded:

> I felt that the jury process worked. However, since then, I've kind of questioned whether I was fair and unbiased, what I said and what I did.
>
> I mean, ultimately, it was great because it was a not guilty verdict. So it didn't—to me, it didn't hurt. And so I let it go.

The State further clarified prospective juror 2's feelings on the earlier case, asking:

> [State]: So you ended up coming up with a not guilty verdict?
>
> Prospective Juror 2: Yes.
>
> [State]: And you said it didn't hurt the defendant, was your comment.
>
> Prosecutive Juror 2: To me, it didn't because he was not guilty, right?
>
> [State]: But you had a victim in that case too?
>
> Prospective Juror 2: Yeah. She never showed up for the case. So. . .

Defense counsel then similarly questioned prospective juror 2:

> [Defense Counsel]: No. 2, you had mentioned kind of reflecting later about your experience, wondering if you had been fair and unbiased. I don't want to put words in your mouth.
>
> When talking about beyond a reasonable doubt, when you went home later, can you talk us through—and I don't mean to pick on you—but, you know, reflecting back and your doubt or lack thereof?
>
> Prospective Juror 2: Yeah, I think, you know, when you're in it, it's really hard to think about what you don't know and what you do know. You try.
>
> And so when I went home and I was able to reflect a little bit more about the whole thing, I said, well, I wish they had asked this. I wish the police had asked this of the defendant. I wish that the

4

lawyers had asked this of—and because I have those questions, which is where my thought came in.

Otherwise, I guess, you know, I thought that given the information that was provided that what we decided—what we decided was the right thing.

[Defense Counsel]: So you felt, after reflecting, that—

Prospective Juror 2: I thought it was okay.

[Defense Counsel]: The decision that you made, you were—you felt comfortable with?

Prospective Juror 2: Well, you know, like I said, it was because we said not guilty. And I like to give people benefit of the doubt, in a sense, you know. And if we had said guilty, I think I might have felt worse about that decision.

During defense counsel's second round of voir dire, counsel asked prospective juror 2 to discuss what kind of evidence she would expect to see in a criminal case. While responding, prospective juror 2 mentioned that she had been reading a book about a death row defendant who was later exonerated:

[Defense Counsel]: So what I'm asking about specifically is the nature. What types of—

Prospective Juror 2: You mean like videos or testimony by a witness or something like that?

Unfortunately, I don't know how much—I—you can't put your thought in whatever they're presenting is real, except maybe videos, or maybe that you don't know.

I'm going off and using your time, I think, but I just finishing reading a book about a person who has been—had been on death row for 30 years, and he—all the evidence that was produced was taken as truth and he was convicted, was put on death row.

After 30 years, they determined he was innocent. I mean, that makes me think about, you know, is what you're presenting true? Even videos or testimony, especially testimony.

The State then sought further questioning related to prospective juror 2's answer. The State asked the juror about the book she referenced, wondering:

5

[State]: And you made a comment. I thought maybe—correct me if I'm wrong—that you thought it's going to be difficult to trust the system as whole?

Prospective Juror 2: Yes, sometimes.

[State]: Why?

Prospective Juror 2: Because in the story and the story is real—there was a lot of prejudice in the system. They presented their evidence as true.

[State]: Okay.

Prospective Juror 2: And the jury believed them as they should, probably. Because it is how could I, as a juror, determine whether someone is telling me the truth or not. They say they are.

[State]: But you would be asked to do that in this case, right?

Prospective Juror 2: You would, yes.

[State]: And you actually had some reservations the last jury you sat on, on whether you could actually trust what was being said?

Prospective Juror 2: No, it wasn't really trust. It was more there was a lack of evidence, I think.

[State]: So do you have any concern that your experience on the jury and then maybe some of the books that you've written [sic] that you wouldn't trust the process as a whole?

Prospective Juror 2: I have more hesitancy in trusting the whole system. I would be a little bit—you know, I wouldn't take everything at face value.

[State]: So you think you could be fair to the State if you were seated on the jury in regards to your past experiences and some of the information you've read?

Prospective Juror 2: I think I would try really hard to do what I'm supposed to do, follow the law, whatever the judge tells us is, you know, we're supposed to be looking at. But how do—I don't know.

[State]: But you have some concerns?

Prospective Juror 2: Yes.

[State]: That you might not be able to do that?

Prospective Juror 2: Yeah. It's hard to make a definitive statement, right? Until I actually see the witness and, you now, how the trial goes on. That is the difficulty.

6

I can tell you, yeah, I'm going to be unbiased, but I don't know what's going to happen in between.

[State]: Okay. So, again, I'm asking do you believe you could be fair to the State with your past experiences as a juror and then the other Information you've read with some of those concerns?

Prospective Juror 2: I think I could be as fair to the State as I am to the defense.

When defense counsel then asked whether she would be able to follow the court's instructions, even with the reservations she had just expressed, prospective juror 2 responded: "I want to say yes, definitely, but I can't. I don't know. I lived a long time, and I got a lot of biases. And I'm not just—you know, even if they tell you to be careful, I can't—but I'll try." She then repeated that she would try her best, but "[could]n't promise."

At the close of voir dire, the State asked the court to dismiss prospective juror 2 for cause, emphasizing that the she had expressed a number of biases and stated she could not promise that she would follow the law or instruction of the court.

The State acknowledged that prospective juror 2 appeared to be of Asian descent, but reiterated "it's her answers to the questions" that raised concerns, highlighting how "she expressed an inability to promise to follow the law and cannot guarantee that she can do so." The court clarified the State's motion to excuse for cause but nonetheless made a record of prospective juror 2's ethnicity.

Defense counsel objected to the State's motion, arguing that the facts did not meet the standard necessary to remove prospective juror 2 for cause. The court reviewed the juror's statements and determined that,

7

Based on the totality of [j]uror [number] 2's answers to questions from both sides, the court finds that [j]uror [number] 2 has expressed reservations about committing to follow the court's instructions on the law.

Juror [number] 2 has expressed concerns about trusting the whole system.

And because of that, I find that the standard to excuse for cause has been met, and I'm going to grant the motion to excuse [j]uror [number] 2 for cause.

<u>Trial</u>

At trial, Yun attempted to argue that the State failed to prove he was driving the minivan because the vehicle was registered to his father. Therefore, he contended, it was possible that Kwang Yun had actually been the one driving. Yun did not call any witnesses to support this defense.

The jury found Yun guilty of attempting to elude pursuing law enforcement. It was unable to reach a unanimous decision about witness tampering.

The trial court sentenced Yun to 30 days, which it then converted to 240 hours of community service. Yun appeals.

<u>ANALYSIS</u>

<u>Juror Challenge</u>

Yun first contends that the trial court erred in granting the State's motion to challenge prospective juror 2 for cause because an objective observer could view race or ethnicity as a factor in the State's peremptory challenge. Because the State properly exercised a challenge for cause, rather than a peremptory challenge subject to GR 37, we conclude that the trial court did not err in granting the State's motion.

In 2018, the Washington Supreme Court adopted GR 37 to address unconscious bias in jury selection and the shortcomings of the existing *Batson*[2] standard. GR 37 aims to "eliminate the unfair exclusion of potential jurors based on race and ethnicity." GR 37(a). To utilize GR 37, either party "may object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c).

Once an objection is made, "the party exercising the peremptory challenge shall articulate the reasons the peremptory challenge has been exercised." GR 37(d). Then, the court must "evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances." GR 37(e).

Certain reasons are presumptively invalid bases for exercising a peremptory challenge, such as previous contact with law enforcement officers or a distrust of law enforcement. GR 37(h)(i)-(ii). "If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e). GR 37(f) defines an "objective observer" as someone who is "aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors Washington State."

---

[2] *Batson* created a three-step process for challenging peremptory challenges based on race. 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The defendant must first establish a prima facie case that "gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. Then, "the burden shifts to the State to come forward with a neutral explanation" for the challenge. *Batson*, 476 U.S. at 97. If the State meets this burden, then "[t]he trial court [has] the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98.

But a challenge for cause is different from a peremptory challenge. *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 815, 425 P.3d 807 (2018). "A peremptory challenge is an objection to a juror for which no reason need be given, but upon which the court shall exclude the juror." RCW 4.44.140. Each party has a limited number of peremptory challenges. *Sassen Van Elsloo*, 191 Wn.2d at 815.

Challenges for cause, in contrast, " 'are narrowly specified by statute and court rule,' " and " 'a party must be able to state on the record a legally sufficient reason for the challenge.' " *Sassen Van Elsloo*, 191 Wn.2d at 815 (quoting *State v. Vreen*, 99 Wn. App. 662, 668, 994 P.2d 905 (2000)). There is no limit on challenges for cause. *Sassen Van Elsloo*, 191 Wn.2d at 815.

As GR 37 governs peremptory challenges, it is not the test applicable to dismissal of a juror for cause. *State v. Tesfasilasye*, 200 Wn.2d 345, 359, 518 P.3d 193 (2022). "If a juror can be excused for cause, they should be excused for cause. Biased jurors simply should not be seated. But GR 37 is qualitatively different and is aimed at curing a different problem." *Tesfasilasye*, 200 Wn.2d at 359.

The trial court should grant a challenge for cause, based on actual bias, if a juror has formed an opinion and the court is satisfied from all of the circumstances that the juror cannot disregard that opinion and try the issue impartially. *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015).

We review a trial court's decision about a challenge for cause for a manifest abuse of discretion. *State v. Noltie*, 116 Wn.2d 831, 838, 809 P.2d 190 (1991).

Here, prospective juror 2 initially expressed concerns about whether she had been fair and unbiased during a past jury experience. When responding to questions about evaluating evidence, the juror suggested mistrust of counsel, stating "I don't know how much—I—you can't put your thought in whatever they're presenting is real, except maybe videos, or maybe that you don't know. The juror then went on to reference a book they have been reading where a person had been exonerated after 30 years on death row. This book, the juror indicated, "makes me think about, you know, is what you're presenting true? Even videos or testimony, especially testimony." When the State then attempted to clarify whether prospective juror 2 could be fair to both parties, she stated she would "try really hard" but did not know. When defense counsel then asked prospective juror 2 if she could follow the trial court's instructions, she said "I want to say yes, definitely, but I can't. I don't know. I lived a long time, and I got a lot of biases. And I'm not just—you know, even if they tell you to be careful, I can't—but I'll try."

Prospective juror 2's statements clearly indicate that she did not know if she could be fair to both parties. In fact, prospective juror 2 expressly stated that she could not guarantee she would follow the law or court instructions. Because prospective juror 2 expressed actual bias, and a biased juror should not serve on a jury, the trial court did not abuse its discretion in granting the State's challenge for cause.

11

Ineffective Assistance of Counsel

Yun next asserts that defense counsel's failure to specifically object to the State's peremptory challenge under GR 37 constitutes ineffective assistance of counsel. Because counsel's performance was not deficient, we disagree.

Ineffective assistance of counsel claims are "mixed questions of law and fact" that we review de novo. *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 865, 16 P.3d 610 (2001).

To demonstrate ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *In re Pers. Restraint of Crace*, 174 Wn. 2d 835, 840, 280 P.3d 1102 (2012). To establish deficient performance, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *State v. Goldberg*, 123 Wn. App. 848, 852, 99 P.3d 924 (2004). To establish prejudice, a defendant must show that, but for counsel's performance, the result would have been different. *Goldberg*, 123 Wn. App. at 852.

The defendant has the burden to overcome the "strong presumption" that counsel's representation was effective. *State v. McFarland*, 127 Wn.2d 322, 337, 899 P.2d 1251 (1995). Counsel's failure to offer a frivolous objection will not support a finding of ineffective assistance. *State v. Briggins*, 11 Wn. App. 687, 692, 524 P.2d 496 (1974).

Here, defense counsel properly objected to the motion to remove prospective juror 2 for cause under the standards applicable to challenges for

cause.  Because GR 37 is not the test applicable to dismissal of a juror for cause, additionally objecting under GR 37 would have been frivolous.  Failing to do so does not fall below an objective standard of reasonableness.

Because defense counsel's performance did not fall below an objective standard of reasonableness, Yun was not subject to ineffective assistance of counsel.

<u>Sufficiency of Evidence</u>

Lastly, Yun claims that the State failed to present sufficient evidence proving the eluding charge beyond a reasonable doubt.  We disagree.

"Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt."  *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017).  In evaluating the sufficiency of evidence, the reviewing court accepts the truth of the State's evidence and draws all reasonable inferences therefrom in the light most favorable to the State.  *Cardenas-Flores*, 189 Wn.2d at 264.  This court defers to the finder of fact on issues of witness credibility, persuasiveness, and conflicting testimony.  *State v. Roberts*, 32 Wn. App. 2d 571, 584, 553 P.3d 1122 (2024), *granting review in part*, 4 Wn.3d 1009 (2025).  Circumstantial and direct evidence are equally reliable.  *Cardenas-Flores*, 189 Wn.2d at 265.

RCW 46.61.024(1) provides the required elements of an eluding charge: "[a]ny driver of a motor vehicle who willfully fails or refuses to immediately bring his or her vehicle to a stop and who drives his or her vehicle in a reckless

13

manner while attempting to elude a pursuing police vehicle. . . shall be guilty of a class C felony."

Yun asserts that the State failed to prove that all the required elements beyond a reasonable doubt because a vague, general description is insufficient to establish identity. But the State provided clear and corroborated testimony identifying Yun.

Corporal Timmons testified that she pursued a maroon minivan for a significant distance. When the driver of that minivan made a U-turn at a stoplight in an attempt to evade her, he drove back past Corporal Timmons' stationary vehicle. She observed him to be a "bald Asian male." She further testified that she made eye contact with the driver, who smiled at her.

Only minutes later, Corporal Timmons recognized both the vehicle and the driver at Planet Fitness. Traulsen identified the driver as Yun, informing law enforcement that Yun stated he was being chased by the police when he first arrived at the gym. Yun himself acknowledged his role by giving Corporal Timmons his reasons for failing to pull over.

Yun cites to an unpublished case, *State v. Frieday*,[3] for the proposition that a "vague general description" is insufficient to establish identity beyond a reasonable doubt. Corporal Timmon's description, Yun suggests, is analogously vague. But *Frieday* is both distinguishable and non-binding.

---

[3] No. 72368-5-I, (Wash. Ct. App. Nov. 17, 2014) (unpublished), https://www.courts.wa.gov/opinions/pdf/723685.pdf

In *Frieday*, the law enforcement officer testified that he "never saw" the driver at issue and no other testimony linked the defendant to the vehicle at issue. Slip op. at 5. The court determined that evidence that the defendant owned the vehicle and a vague description of the driver was insufficient to establish identity.

Here, Corporal Timmons made eye contact with the driver, who she then identified as Yun. She explained clearly to the jury that the person she saw driving the van was the same person she identified as Yun at Planet Fitness. Also, she differentiated between Woo Yun and Kwang Yun, the registered owner. Having obtained Kwang Yun's driver's license photo, Corporal Timmons concluded he could not have been the driver because he was older and had more hair.

Corporal Timmon's identification, supported by both Traulsen and Yun's statements, and viewed in the light most favorable to the State, establishes Yun's identity beyond a reasonable doubt. Therefore, sufficient evidence demonstrates all elements of the charge.

We affirm.

_____

WE CONCUR:

_____     _____, ACJ

15